Joel Benjamin Young (SBN 236662)
jby@tidricklaw.com
**THE TIDRICK LAW FIRM LLP**
1990 N. California Blvd., 8th Floor
Walnut Creek, CA 94596
Tel: (510) 788-5100
Fax: (510) 291-3226

Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (*pro hac vice* forthcoming)
nicolec@salahilaw.com
**SALAHI PC**
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DOMINIK CALHOUN**, on behalf of himself and all others similarly situated;<br><br>*Plaintiff,*<br><br>v.<br><br>**CALIFORNIA INTERSCHOLASTIC FEDERATION; CENTRAL SECTION OF CALIFORNIA INTERSCHOLASTIC FEDERATION; CENTRAL COAST SECTION, CALIFORNIA INTERSCHOLASTIC FEDERATION; CIF LOS ANGELES CITY SECTION; NORTH COAST SECTION OF THE CALIFORNIA INTERSCHOLASTIC FEDERATION; NORTHERN SECTION CALIFORNIA INTERSCHOLASTIC FEDERATION; OAKLAND ATHLETIC LEAGUE, CIF OAKLAND SECTION; CALIFORNIA INTERSCHOLASTIC FEDERATION-SAC-JOAQUIN SECTION; CALIFORNIA INTERSCHOLASTIC FEDERATION, SAN DIEGO SECTION; CALIFORNIA** | Case No. 3:25-cv-4603<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**INTERSCHOLASTIC FEDERATION SAN FRANCISCO CITY SECTION, CALIFORNIA INTERSCHOLASTIC FEDERATION SOUTHERN SECTION**, all California non-profit corporations; **2080 MEDIA, INC.; HUDDLE TICKETS, LLC; NFHS NETWORK, LLC; MAXPREPS, INC.; VNN, INC.;  PLAYFLY, LLC, SBLIVE SPORTS, INC.,** and **SPECTRUM SPORTSNET, LLC**, all Delaware for-profit corporations,

*Defendants*.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................5

II. JURISDICTION AND VENUE ...........................................................................6

III. PARTIES ............................................................................................................7

    A. Plaintiff Dominik Calhoun ......................................................................... 7

    B. Defendant California Interscholastic Federation ....................................... 8

    C. California Interscholastic Federation Section Defendants ......................... 10

    D. Media Defendants ..................................................................................... 14

IV. CIF RULES RESTRAINING COMPETITION ..................................................18

    A. CIF Rules Forbidding Compensation for Student-Athletes' Athletic Labor ........... 19

    B. CIF Rules Limiting Transfers for Athletic Reasons ................................... 21

    C. CIF Rules Limiting NIL Compensation ...................................................... 28

    D. CIF Rules Mandating Section and Member School Adherence .................. 31

V. RELEVANT MARKETS ....................................................................................33

    A. The California High School Athletic Labor Market ..................................... 33

    B. The California High School Student-Athlete NIL Market ........................... 38

VI. FACTUAL ALLEGATIONS ...............................................................................39

    A. High School Sports Are a Booming Industry ............................................. 39

    B. CIF, the Section Defendants, and the Media Defendants Already Profit from Student-Athletes' Labor and NIL ................................................ 42

    C. CIF's Anticompetitive Rules Harm Student-Athletes ................................ 51

        1. The Challenged Restrictions Prevent the Growth of a Competitive Market for Student-Athletes' Labor .................................... 51

        2. The Challenged Restrictions Hamper the Growth of a Competitive Market for Student-Athletes' NIL ........................................ 57

    D. CIF's Anticompetitive Rules Are Not Necessary to Serve Any Legitimate Pro-Competitive Purpose .................................................. 63

        1. Consumer Demand for High School Sports Is Legally Irrelevant Because It Concerns an Entirely Different Market ......................... 63

        2. Education and Compensation Are Not Mutually Exclusive. ................... 66

        3. The Challenged Restrictions Disproportionately Harm Low-Income and Student-Athletes of Color ................................................ 70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**VII.    CLASS ALLEGATIONS** ............................................................................**73**

**VIII.       CAUSES OF ACTION** ............................................................................**75**

**IX. PRAYER FOR RELIEF** ..................................................................................**83**

**X.  JURY DEMAND**.............................................................................................**83**

Plaintiff Dominik Calhoun individually, and on behalf of all others similarly situated, brings this action for damages and equitable relief against Defendants California Interscholastic Federation ("CIF"), Central Section of California Interscholastic Federation ("CIF-Central"); Central Coast Section, California Interscholastic Federation ("CIF-Central Coast"); CIF Los Angeles City Section ("CIF-LA"); North Coast Section of the California Interscholastic Federation ("CIF-North Coast"); Northern Section California Interscholastic Federation ("CIF-Northern"); Oakland Athletic League, CIF Oakland Section ("CIF-Oakland"); California Interscholastic Federation-Sac-Joaquin Section ("CIF-Sac-Joaquin"); California Interscholastic Federation, San Diego Section ("CIF-San Diego"); California Interscholastic Federation San Francisco City Section ("CIF-San Francisco"); California Interscholastic Federation Southern Section ("CIF-Southern") (together, "CIF Defendants"); 2080 Media, Inc.; Huddle Tickets, LLC; NFHS Network, LLC; MaxPreps, Inc.; VNN, Inc.; Playfly, LLC, SBLive Sports, Inc.; and Spectrum SportsNet, LLC (together, "Media Defendants"), and alleges as follows:

## I.    **INTRODUCTION**

1.    This is a class action lawsuit brought on behalf of high school athletes in California who participate or have participated in interscholastic athletics governed by the California Interscholastic Federation and its constituent Sections.  The hard work and dedication of these athletes generates significant economic value for private corporations and athletic associations, but because of the anticompetitive conduct challenged in this case, these athletes are unfairly deprived of the opportunity to receive a fair share of the value they create.

2.    CIF is an independent non-profit corporation that operates as the sole regulatory authority over high school sports in California.  Its membership includes over 1,600 private and public schools throughout the state, who are further organized geographically into ten administrative Sections.

3.    CIF, its Sections, its member schools, and their corporate media partners generate substantial revenues through the commercial exploitation of student athletes' athletic performances, names, images, and likenesses ("NIL"), including via broadcasting rights,

streaming services, sponsorships, advertising, ticketing, and merchandise sales.  They also profit from the many hours of athletic labor supplied by their student-athletes.  Yet they provide no compensation to the student-athletes themselves and, by and large, prohibit them from receiving any compensation associated with such activities.  Indeed, CIF rules prohibit student-athletes from receiving remuneration for their athletic accomplishments or the use of their NIL in connection with their high school team, even though CIF and its partners monetize that NIL across various platforms.  Student-athletes are also forbidden from receiving financial rewards for their athletic performance and from transferring between CIF member schools for athletic reasons, thus foreclosing their participation in a competitive market for their athletic labor.

4.    These policies harm the high school student-athletes who create the economic value exploited by CIF, its Sections, its member schools, and their commercial partners, and constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act. 15 U.S.C. § 1 *et seq*., the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*, and the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*  Plaintiff seeks class-wide damages, as well as injunctive and declaratory relief related to Defendants' unlawful restraint of trade, on behalf of a class of similarly situated current and former high-school student-athletes.

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges violations of federal law, specifically Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  The Court also has jurisdiction under 28 U.S.C. § 1337 as this action arises under federal antitrust law, and under 28 U.S.C. § 1367 for supplemental jurisdiction over Plaintiff's state law claims for antitrust and unfair competition violations, and unjust enrichment.  This Court also has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which the amount in controversy exceeds $5,000,000 and at least one member of the class is a citizen of a state or country different from at least one Defendant.

6.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. §§ 1391 and 15 U.S.C. § 22 because Defendants transact substantial business in this District, a significant portion of the relevant conduct occurred in this District, and many members of the proposed Class reside in this District and were harmed within it.  CIF and its Sections regularly conduct interscholastic competitions, administer eligibility rules, and license the commercial use of high school athletic content in this District.

7.    Defendants are subject to the personal jurisdiction of this Court because they have purposefully availed themselves of the privilege of conducting business within California and within this District, and the claims arise from conduct that has caused foreseeable harm to Class members residing in the District.

## III.    PARTIES

### A.    Plaintiff Dominik Calhoun

8.     Plaintiff Dominik Calhoun is a resident of Contra Costa County, California and a former CIF athlete who competed for El Cerrito High School's football team for the 2021 and 2022 seasons, and for Pittsburg High School's track and field and football teams for the 2023 and 2024 seasons.

9.    Mr. Calhoun is a three-star recruit, according to On3, 247Sports, Rivals, and ESPN.  In his high-school career, he recorded 68 tackles, including 4.0 TFLs (tackles for loss). He led Pittsburg High School's team to a North Coast Section title.  He has been signed to play for the Boise State Broncos after graduating high school in 2025.

10.    Because CIF rules prohibited him from doing so, Mr. Calhoun never received any personal compensation from CIF or other Defendants' use of his athletic labor or his name, image, and likeness in their broadcast, marketing, and social media activities, nor from other activities to generate ticket sales and other revenues.  As a high school student-athlete, Mr. Calhoun did not receive any personal compensation from his own use of his athletic labor or his name, image, or likeness in connection with his high school team, because CIF rules prohibited him from doing so.

11.     Mr. Calhoun has already begun to receive NIL compensation in connection with his collegiate athletic career for Boise State University, including his appearance at autograph sessions and other public events organized by Boise State's NIL collective.  But for Defendants' conduct challenged herein, Mr. Calhoun, like other similarly situated athletes, would have received such compensation in connection with his high school athletic participation, too.

12.     Mr. Calhoun was a valuable asset to the high schools for which he played.  By participating in CIF events, Mr. Calhoun's athletic labor and NIL helped generate substantial revenues that derived from, among other things, broadcasting agreements, ticket sales, and sponsorships.  But CIF's rules prohibited him from earning any compensation or benefits for his athletic services at CIF member schools.  But for those rules, Mr. Calhoun, like other similarly situated student-athletes, would have received compensation for his athletic labor and NIL.  He was harmed by the CIF rules challenged herein.

**B.      Defendant California Interscholastic Federation**

13.     **Defendant California Interscholastic Federation ("CIF")** is the governing body for high school sports in the State of California.  Its members include more than 1,600 public and private high schools, nearly all of the state's high schools.  CIF was formed as a California nonprofit public benefit corporation, and is headquartered at 4658 Duckhorn Dr., Sacramento, California 95834.

14.     The California Interscholastic Federation was formally organized at a high school athletic convention in Los Angeles in March 1914, held for the purpose of organizing high school athletics on a state-wide basis under the control of the principals and physical directors of the schools.  A constitution and by-laws were adopted, under which CIF's Federated Council has conducted the business of CIF since its first meeting on July 1, 1914.

15.     Over the next century, CIF expanded to include nearly all high schools in the state of California as members, including both public and private high schools.  CIF has become the largest youth agency in the nation, serving more than 800,000 young student athletes each year who participate in interscholastic athletic activities on California high school teams.  In CIF-

Southern, the largest CIF Section, 35% of public high school students participate on athletic teams, and 50% of private high school students participate on athletic teams.

16.    CIF was originally established to standardize rules for high school athletic competitions, but it has since expanded its mandate.  For example, CIF offers educational programs in coaching education and parent education, and has adopted the principles of Pursuing Victory With Honor (a character education program) as the cornerstone of the organization.

17.    CIF and its member sections have also taken part in corporate sponsorship since the earliest days of CIF's existence—one source reports that the F.B Silverwood Clothing Store sponsored the 1915 CIF-SS Track and Field Championships with their logo on the program cover.

18.    CIF is governed by the CIF Federated Council, which consists of high school superintendents, principals, athletic directors, educators, and allied organizations.  Per Article 2, Section 24 of CIF's Constitution, "[a]ll students attending either public or private high schools in any Section under the jurisdiction of the Federation will be subject to the rules of eligibility of the Federated Council for participation in athletic contests between/among schools" and "[a]ll CIF member schools are accountable to the Federated Council for violations of the CIF Constitution and Bylaws."

19.    CIF member schools are organized geographically into ten Sections, and each Section is further broken down into multiple Leagues.  Each CIF member school has a representative at the League level.  At the League level, representatives enact a league constitution and bylaws, elect officers, and select a representative to a Section governing board. The Section governing board, often referred to as the Board of Managers, enacts its own constitution and bylaws, elects officers, and establishes Section policies and rules.  Finally, Section governing boards select representatives to the CIF Federated Council.

20.    The Federated Council meets three times a year and is the only body that can enact or amend statewide rules.  The Council includes Section representatives, a superintendents' representative, and delegates from various organizations such as the California Coaches

1  Association and the California State Athletic Directors Association.  Finally, CIF is governed by

2  an Executive Committee consisting of no more than 13 members of the Federated Council,

3  including Federated Council officers, representatives of sections/allied organizations, and at-

4  large representatives.

5          21.     Per Article 3, Section 34(B) of the CIF Constitution, Sections only have the

6  jurisdiction delegated to them by the Federated Council.  Further, the Federated Council has

7  authority to establish and enforce penalties for any violation of CIF's Constitution and Bylaws or

8  other Federation rules; schools, leagues, and sections may establish and enforce penalties only if

9  they are not in conflict with those established by the Federated Council.  CIF Constitution,

10 Article 3, Section 34(D).

11         **C.      California Interscholastic Federation Section Defendants**

12         22.     CIF supervises ten semi-autonomous, geographical "Sections."  Each Section was

13 created as a nonprofit corporation or unincorporated association organized to direct and control

14 both boys' and girls' athletics in the secondary schools within the Section.  Each Section

15 maintains jurisdiction over sports competitions between high schools in its designated area and is

16 permitted to promulgate its own rules so long as they do not conflict with CIF State rules, per

17 CIF Constitution, Article 3, Section 34(D).  Each Section operates under the statewide CIF

18 Constitution and Bylaws, and most Sections maintain their own additional governance

19 documents.  Each Section enforces CIF State's NIL restrictions and participates in the

20 commercialization of high school athletics through championship broadcasts, video sales, ticket

21 sales, sponsorships, branded media, and other revenue streams.

22         23.     **Defendant Central Section of California Interscholastic Federation ("CIF-**

23 **Central")** covers 139 schools in the central and southern portions of the San Joaquin Valley, the

24 Eastern Sierra region, San Luis Obispo County, and northern Santa Barbara County and is

25 headquartered in Kingsburg, California.  CIF-Central operates under the statewide CIF

26 Constitution and Bylaws, and also maintains its own Central Section Constitution, Bylaws, and

27 Sport Governing Rules, known as the "Orange Book."  CIF-Central officials are responsible for

managing "Social Media," "Awards," "Ejection and Misconduct Reports," "New Athletic Director Training," "Rulebooks," "Championship Merchandise," "Finances," "Transfer Eligibility," and "Constitution and Bylaws."  CIF-Central engages in marketing, sponsorship, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including GoFan Tickets and NFHS Network.

24.     **Defendant Central Coast Section, California Interscholastic Federation ("CIF-Central Coast")** covers a coastal area of California between San Francisco and King City, and is headquartered in San Jose, California.  It encompasses 159 schools and nearly 75,000 student-athletes.  CIF-Central Coast operates under the statewide CIF Constitution and Bylaws, and also maintains its own Central Coast Section Constitution, Bylaws, and Policies. CIF-Central Coast maintains bylaws covering "Eligibility" and policies that include a "Recruiting Policy," "Awards Policy," and "Financial Policy."  CIF-Central Coast officials have responsibility for "Recruiting," "Social Media," "NFHS Network," "Contracts," and "Finance."

25.     **Defendant CIF Los Angeles City Section ("CIF-LA")** covers 153 high schools in the Los Angeles Unified School District and is headquartered in Granada Hills, California. CIF-LA operates under the statewide CIF Constitution and Bylaws and also maintains its own LA City Section Rules and Regulations, known as the "Gold Book."  CIF-LACS employees are responsible for the "Gold Book," "Eligibility," "Rule Waivers," "Transfer Eligibility," "Section Publicity," "Social Media," "Sponsor Awareness," and "Investments."  CIF-LA engages in marketing, sponsorship, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including GoFan Tickets, MaxPreps, NFHS Network, and SBLive Sports.  CIF-LACS also obtains corporate sponsors, such as California Community Colleges.

26.     **Defendant North Coast Section of the California Interscholastic Federation ("CIF-North Coast")** covers the coastal area from California's northern border to the Bay Area, encompassing 177 high schools, and is headquartered in San Ramon, California.  CIF-North Coast operates under the statewide CIF Constitution and Bylaws and also maintains its own

North Coast Section Constitution and Bylaws. CIF-North Coast employees are responsible for "Final review of all transfers involving athletic motivation," "Sponsorship," and "Broadcast Rights." CIF-North Coast engages in marketing, sponsorship, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including GoFan Tickets and NFHS Network.

27.    **Defendant Northern Section California Interscholastic Federation ("CIF-Northern")** covers a large inland area in northern California, encompassing 67 high schools, and is headquartered in Chico, California. CIF-Northern operates under the statewide CIF Constitution and Bylaws. CIF-Northern engages in marketing, sponsorship, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including GoFan Tickets, NFHS Network, PrestoSports, SBLive Sports, MaxPreps.

28.    **Defendant Oakland Athletic League, CIF Oakland Section ("CIF-Oakland")** is an unincorporated nonprofit association that covers 31 high schools in the Oakland area and is headquartered in Oakland, California. CIF-Oakland operates under the statewide CIF Constitution and Bylaws and also maintains its own Oakland Section Rules and Regulations. CIF-Oakland "is administered on a day-to-day basis by the Commissioner, Regional Managers and an Administrative Assistant." CIF-Oakland engages in marketing, sponsorship, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including GoFan Tickets and NFHS Network.

29.    **Defendant California Interscholastic Federation-Sac-Joaquin Section ("CIF-Sac-Joaquin")** is the second-largest section in the state by geography, encompassing 14,500 square miles and 195 high schools, and is headquartered in Elk Grove, California. CIF-Sac-Joaquin operates under the statewide CIF Constitution and Bylaws, and also maintains its own Sac-Joaquin Section Constitution and Bylaws. CIF-Sac-Joaquin engages in marketing, sponsorship, merchandise sales, investments, and digital content production in partnership with

several sports marketing companies that exploit student-athletes' NIL, including GoFan Tickets, MaxPreps, NFHS Network, and SBLive Sports.

30.    **Defendant California Interscholastic Federation, San Diego Section ("CIF-San Diego")** covers 128 high schools in the San Diego area and is headquartered in San Diego, California.  CIF-San Diego operates under the statewide CIF Constitution and Bylaws, and also maintains its own San Diego Section Constitution and Bylaws, known as the "Green Book," as well as its own Policies and Procedures manual.  CIF-San Diego engages in marketing, sponsorship, merchandise sales, investments, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including GoFan Tickets, MaxPreps, NFHS Network, and SBLive Sports.

31.    **Defendant California Interscholastic Federation San Francisco City Section ("CIF-San Francisco")** is an unincorporated association covering 17 schools in the San Francisco area and is headquartered in San Francisco, California.  CIF-San Francisco operates under the statewide CIF Constitution and Bylaws, and also maintains its own San Francisco Section Constitution and Bylaws.  CIF-San Francisco engages in marketing, sponsorship, merchandise sales, investments, and digital content production in partnership with several sports marketing companies that exploit student-athletes' labor and NIL, including MaxPreps, NFHS Network, and SBLive Sports.

32.    **Defendant California Interscholastic Federation Southern Section ("CIF-Southern")** is the largest regional Section of CIF, covering 61,244 square miles and 558 schools in Los Angeles, Orange, Riverside, San Bernadino, San Luis Obispo, Ventura, Santa Barbara, and Kern counties.  CIF-Southern is headquartered in Los Alamitos, California.  CIF-Southern operates under the statewide CIF Constitution and maintains its own rulebook known as the "Blue Book."  CIF-Southern has entered into exclusive streaming and sponsorship arrangements which exploit student-athletes' labor and NIL, including a six-year agreement with the NFHS Network and marketing partnerships with Playfly Sports.

**D.    Media Defendants**

33.    **Defendant 2080 Media, Inc.** is a for-profit corporation formed in the State of Delaware with its principal place of business in Atlanta, Georgia, doing business under the name "PlayOn! Sports" ("PlayOn").  PlayOn was spun off from Turner Broadcasting, and it owns and controls the software brands and services GoFan Tickets, MaxPreps, MaxPreps Advantage, NFHS Network, VNN, and rSchoolToday.  The software brands controlled by PlayOn are used by over 75% of U.S. high schools, including many schools in California.  One press release stated, "Best known for operating the NFHS Network and GoFan, PlayOn! provides streaming and digital ticketing services to over 10,000 schools and sets the standard for in-person, live-stream and on-demand events."  The software products and services offered by PlayOn and its subsidiary brands include (1) athletic website design, (2) broadcasting and streaming, (3) concessions, (4) coaching tools and analytics, (5) digital ticketing, (6) fundraising, (7) schedules, stats and scores, and (8) sponsorships.  As part of its service offerings, PlayOn assists high schools and state interscholastic athletic associations in locating advertisers and sponsors for its various product and service offerings.  PlayOn profits by receiving subscription fees and payment from its customers and taking a cut of any advertising and sponsorship revenue before sharing the rest of the revenue from advertising and sponsorships with its high school and athletic association customers.  However, these revenues are not shared with high school student-athletes in California; instead, PlayOn acquiesced in CIF's scheme to suppress competition for high school student-athletes' athletic labor and NIL.

34.    **Defendant Huddle Tickets, LLC**, is a subsidiary corporation of PlayOn formed in Georgia and headquartered in Alpharetta, Georgia, doing business as "GoFan."  GoFan offers several revenue streams for schools related to (1) digital ticketing, (2) concessions, (3) fundraising, and (4) sponsorships.  It promises to help schools with "selling tickets online and onsite, accepting digital payments for concessions, raising funds effortlessly, and streaming all your events live and on demand."  Concerning its ticket sponsorship offerings, GoFan states, "We'll find a sponsor for you and share a portion of the net revenue generated," and "Your

school will share a portion of net revenue generated for this sponsorship, benefitting your school's programs and initiatives." However, these revenues are not shared with high school student-athletes in California; instead, GoFan acquiesced in CIF's scheme to suppress competition for high school student-athletes' athletic labor and NIL.

35. **Defendant NFHS Network, LLC** is a subsidiary corporation of PlayOn incorporated in Delaware and headquartered in Atlanta, Georgia. The NFHS Network, "a first-of-its-kind, all-digital network, was started in 2013 by the NFHS, PlayOn! Sports and participating NFHS member associations to showcase high school student- athletes participating in 27 sports covered by the Network." The NFHS Network boasts that it partners with "44+ high school state athletic/activities associations" and "over 8,000 schools" (that is, "over half of high schools in the nation"), making it "the leader in streaming Live and On Demand high school sports." Schools do not pay to stream their athletic events on NFHS Network; rather, they are paid by NFHS Network to participate. Through its "School Broadcast Program," NFHS Network promises to make "broadcast production easy by providing the software, tools, equipment, and training [schools] need for free." NFHS Network then collects subscription revenues directly from consumers, and remits a portion of those revenues (between 10-20%) to schools. NFHS Network also includes advertising slots, and presumably shares a cut of any advertising revenue with schools. NFHS Network touts itself as "the only national high school network available." However, none of these revenues are shared with high school student-athletes; instead, NFHS Network acquiesced in CIF's scheme to suppress competition for high school student-athletes' athletic labor and NIL.

36. **Defendant MaxPreps Inc.** is a subsidiary corporation of PlayOn incorporated in Delaware and headquartered in Atlanta, Georgia. MaxPreps was started in 2002, and acquired by PlayOn in or around April 2025. MaxPreps advertises itself as "the nation's leading platform for high school sports coverage, providing comprehensive information on teams, athletes, and competitions across the United States," and "the trusted destination for scores, schedules, rankings, statistics, and content that connects communities with their local high school sports

programs." MaxPreps covers 29 different sports across boys, girls, and co-ed categories, with detailed information on game scores, team and player statistics, season schedules and results, athlete profiles and achievements, photos and video highlights, and news and feature stories. On MaxPreps' websites, "[s]tudent-athletes have digital profiles showcasing achievements, statistics, and highlights for college recruiting." According to MaxPreps, it provides images, video, and data to "millions of high school sports fans, student-athletes, coaches, and administrators each month." However, none of these revenues are shared with high school student-athletes; instead, MaxPreps acquiesced in CIF's scheme to suppress competition for high school student-athletes' athletic labor and NIL.

37.    **Defendant VNN, Inc.** (formerly "Varsity News Network, Inc.") is a subsidiary corporation of PlayOn incorporated in Delaware and headquartered in Grand Rapids, Michigan. VNN describes itself as "the most-loved marketing, communications, and coordination platform for high school sports," and states that it is "[t]rusted by over 2,500 high school athletic departments nationwide." In March 2022, VNN merged with another leading high school sports marketing company, rSchoolToday. A press release announcing the merger stated, "VNN, makers of the fastest-growing communication platform for high school athletics, has announced that it is joining rSchoolToday, the largest cloud-hosted management software maker for high school activities in the US. Together, the companies will combine operations to create an organization that provides software to athletic and activities departments in 40% of US high schools." Then, in 2023, rSchoolToday merged with PlayOn. After these mergers, VNN's "advertising business [was] rebranded as the VNN Advertising Network." In touting its advertising network, VNN states that "The largest audience in sports is high school," with 510 million attendees at sporting events since 2011, compared to 17.3 million NFL attendees and 73.7 million MLB attendees. Among other services, VNN offers to connect advertisers to advertising opportunities presented by high school sporting events. However, none of these revenues are shared with high school student-athletes; instead, VNN acquiesced in CIF's scheme to suppress competition for high school student-athletes' athletic labor and NIL.

38.    **Defendant Playfly, LLC** is a limited liability company formed in the State of Delaware with its principal place of business in Sacramento, California.  It markets itself as "a full-service sports marketing company operating where sports marketing, media & technology converge."  Playfly began with the acquisition of two sports media companies in 2020, Outfront Media Sports and Collegiate Star League (CSL).  It then acquired three business units from FOX in March 2021: Home Team Sports, Impression Sports and Entertainment, and Fox Sports College Properties.  Playfly describes itself as "the leading revenue maximizer in the sports industry.  Our consultative, data-driven approach to reach, engage, monetize and measure fandom gives our property and brand partners a competitive advantage."  It boasts that it represents "the largest state high school athletic association in California Interscholastic Foundation," and has a dedicated team of personnel for managing the CIF portfolio.  Its website acknowledges that "High School Sports is a key steppingstone in the complete life cycle of both fans and athletes, alike.  Playfly Sports properties supports state high school sports associations throughout North American by developing commercial strategies to sustain development of high school athletes on the field/court/ice/track and in the classroom."  At the high school level, Playfly offers sports marketing services including on-premise signage, game sponsorships, content platforms, tickets and hospitality, data and digital solutions, and community outreach.  However, none of the revenues from these activities are shared with high school student-athletes; instead, Playfly acquiesced in CIF's scheme to suppress competition for high school student-athletes' athletic labor and NIL.

39.    **Defendant SBLive Sports, Inc.** is a for-profit corporation incorporated in Delaware and headquartered in Spokane, Washington.  SBLive describes itself as an "End-to-End software solution for scorekeeping and media publishing and distribution that focuses on high school sports."  It claims to be the "digital destination for high school sports fans and a technology partner of state associations, coaches and administrators.  Our platform celebrates high school sports, making it possible for the next generation of fans to follow their favorite teams and players just like they follow the pros."  SBLive partners with Sports Illustrated to

1   provide "High School on SI," a news platform dedicated to high school sports. According to

2   SBLive and Sports Illustrated, this "dedicated high school experience expands Sports

3   Illustrated's reach to even more local communities as fans can now truly follow athletes from

4   'preps to the pros' on a single platform, bringing them closer to the action than ever before."

5   Through its SBLive Fan App, "users can follow their favorite teams, track live game updates and

6   discover the best stories in high school sports." CIF is listed as one of SBLive's partner

7   organizations. However, none of the revenues earned from these activities are shared with high

8   school student-athletes; instead, SBLive acquiesced in CIF's scheme to competition for high

9   school student-athletes' athletic labor and NIL.

10        40.    **Defendant Spectrum SportsNet, LLC,** formerly TimeWarner Cable SportsNet,

11   is a limited liability company incorporated in Delaware and headquartered in St. Louis, Missouri.

12   Spectrum SportsNet describes itself as "a regional sports network that launched on October 1,

13   2012. Through its exclusive partnerships with the Los Angeles Lakers, Los Angeles Sparks, and

14   the California Interscholastic Federation (CIF), the 24/7, high-definition network delivers more

15   than 130 live events per year plus extensive team coverage and behind-the-scenes access unlike

16   anything fans have seen before." In 2012, Spectrum agreed to pay CIF State $8.5 million in a

17   fifteen-year deal for the exclusive right to televise events within the jurisdiction of CIF State

18   (that is, state-level events, televised in Southern California). However, none of these revenues

19   are shared with high school student-athletes; instead, Spectrum acquiesced in CIF's scheme to

20   suppress competition for high school student-athletes' athletic labor and NIL.

21        41.    Collectively, CIF, its Sections, and the Media Defendants have acted as a unified

22   combination in restraint of trade, as alleged herein.

23   **IV.    CIF RULES RESTRAINING COMPETITION**

24        42.    CIF and the Section Defendants' anticompetitive agreements are neither secret

25   nor disputable. They are published in CIF's Constitution, Bylaws, and other policy and guidance

26   documents, as well as the Constitutions, Bylaws, and policy and guidance documents of the

27   Section Defendants. These anticompetitive rules and restrictions are proposed, drafted, and

voted upon by CIF, its Sections, and CIF member schools.  Absent the challenged restraints, these entities would have to compete to procure the athletic labor and the NIL of high school student-athletes in the various relevant markets.  CIF's anticompetitive rules are strictly enforced, so that CIF Sections and CIF member schools have no choice but to comply with them or face severe penalties.

43.    Plaintiff brings this suit to challenge and seek damages caused by CIF and the Section Defendants' rules that prohibit, cap, fix the price of, or otherwise limit the compensation that California high school student-athletes may receive from schools, Sections, CIF, or third parties for the use of their names, images, likenesses, and athletic reputations in the manners discussed in this Complaint, as well as compensation for their athletic labor.  Further, Plaintiff challenges the CIF and Section Defendants' eligibility and pre-enrollment contact rules limiting high school student-athletes' ability to transfer schools for athletic purposes.

44.    CIF rules, and each Section Defendant's rules, that prohibit or otherwise limit the compensation that players may receive for their NIL and athletic labor are illegal cartel agreements.  The CIF rules, and each Section Defendant's rules, that limit the ability of high school student-athletes to transfer schools are also illegal cartel agreements.  These rules include, but are not limited to, the CIF Constitution, Bylaws, and other policy and guidance documents (individually, and as interpreted and applied in conjunction with each other).

A.    **CIF Rules Forbidding Compensation for Student-Athletes' Athletic Labor**

45.    CIF limits student-athletes' ability to receive compensation for their athletic labor primarily through Bylaw 212, governing "amateur status."  CIF Bylaw 200(B) limits "eligibility to participate in interscholastic athletics" to those with "Amateur Status."  *Id.* at 200(B)(13).  CIF Bylaw 212(A) provides that "[a] student is governed by CIF amateur rules when the student participates in CIF competition," and that "[a] student who violates CIF amateur or award rules shall be penalized . . . ."

46.    CIF student-athletes violate CIF's definition of "Amateur Status" by "[r]eceiving, from any and all sources, athletic awards totaling more than $250.00 in value for . . .

[a]ccomplishments in any regular CIF high school competition event . . . [or a] recognition award program such as "Player of the Week" or "Player of the Month."  CIF Bylaw 212(C)(1). Although the cap on compensation is slightly higher for post-season games, student-athletes violate CIF's amateurism rule by "[r]eceiving, from any and all sources, athletic awards totaling more than $500.00 in value for any post-regular season CIF high school competition or recognition program."  CIF Bylaw 212(C)(2).  CIF Bylaw 802(D) further states that "[s]uch [an] award cannot be cash, a gift certificate or merchandise alone.  It may be merchandise, badge, medal, plaque, ribbon, picture, certificate, or trophy, if it is suitably engraved or designated as an award."

47.    Student-athletes are also forbidden from "[a]ccepting payment for loss of time or wages while participating in CIF competition;" or "[r]eceiving payment for coaching a team in CIF competition."  CIF Bylaw 212(C)(5)-(6).

48.    Penalties for violations of CIF's amateurism bylaws are mandatory, not discretionary.  See CIF Bylaw 212(D)(1) ("A student determined by their respective CIF Section to have violated any provision of 212.C.(1-6) above *shall* be penalized according to the sanctions listed below." (emphasis added)).  Penalties for a student athlete's first violation include a formal warning and a requirement that the student athlete return any compensation exceeding the $250 and $500 limits.  A second violation results in a one-year period of ineligibility to participate in any CIF interscholastic athletics, while a third violation results in a permanent, outright ban on the student's participation in interscholastic athletics for the remainder of their time in high school.  CIF Bylaw 212(D)(1).

49.    Authority to police violations of CIF's amateurism rule is delegated to student-athletes' respective CIF Sections.  See CIF Bylaw 212(D)(1) ("A student *determined by their respective CIF Section* to have violated any provision of 212.C.(1-6) above shall be penalized according to the sanctions listed below." (emphasis added)).

50.    In addition to the restrictions imposed on student-athletes against accepting awards, CIF rules limit the ability of other entities to offer awards to those athletes.  CIF Bylaw

803, governing "Contributions," provides that "No entity including, but not limited to, booster clubs, individual or corporate donors, school districts, and leagues, may contribute anything in order to make it possible to give an award exceeding the $250.00 or $500.00 value."  The same rule also states that "Awards exceeding the $250.00 and $500.00 values may not be held and given to the student after the student graduates."

51.    All CIF Sections are required to adopt and enforce CIF State's bylaws governing amateur status.  In some cases, Section Defendants maintain even stricter rules concerning amateur status.  For instance, CIF-SS's Bylaw 516 provides that "Financial aid, grants or scholarships given to students based on athletic prowess is prohibited."

52.    CIF Member schools are also required to enforce CIF's limits on amateur status. As a condition of membership, all CIF member schools must agree to "[e]nsure that CIF member schools will not accept monies, equipment or apparel specific to, or distributed to, individual athlete(s) within that program."  CIF Bylaw 22(B)(7).  Instead, "[a]ll gifts are school property . . . and may not be given to any individual athlete(s).  School/school districts should ensure such gifts are distributed equitably."  *Id.*  Compensation may not go to individual athletes for their athletic performance, and instead "[g]ifts supporting travel to athletic competitions must be devoted only to reasonable costs of travel, lodging and food and distributed through the school district, ASB or governing board according to Bylaw 805."  *Id.*

53.    The combined effect of these rules is to forbid any compensation for student-athletes' athletic labor (including for their NIL) over and above CIF's $250 and $500 limits for in-season and post-season athletic events, respectively.  Students are entirely forbidden from receiving compensation in the form of cash, gift certificates, or merchandise, or financial aid, grants, or scholarships, either during their time as a CIF student-athlete or after their graduation.

**B.    CIF Rules Limiting Transfers for Athletic Reasons**

54.    CIF and the Section Defendants' rules also categorically forbid student-athletes from transferring between CIF member schools for "athletically motivated" reasons and proscribe any athletic recruiting efforts by school-affiliated persons as "undue influence."  These

restrictions on transfer eligibility and recruiting preclude the dramatic growth of a competitive market (including submarkets for each sport) of California high school student-athletes selling their athletic labor and use of their NIL to CIF member schools.  These transfer limitations allow CIF and the Section Defendants to artificially cap at zero the amount that CIF, its Sections, and CIF member schools would otherwise have to compete to pay student-athletes for their athletic labor.

55.    CIF Bylaw 200 sets out CIF's "Philosophy" concerning student eligibility for interscholastic athletic competition.  In its "Philosophy" statement, CIF acknowledges that its bylaws are intended, in part, to "[s]erve as a deterrent to students who transfer schools for athletic reasons and to individuals who recruit student-athletes."  CIF Bylaw 200(A)(7).

56.    To effectuate this overtly anticompetitive goal, CIF Bylaws 201 ("Standards of Eligibility"), 206 ("Residential Eligibility"), 207 ("Transfer Eligibility"), and 510 ("Undue Influence") work together to dramatically curtail student-athletes' ability to transfer between CIF member high schools for "athletically motivated" reasons.  Under CIF Bylaw 201, "Standards of Eligibility," students enrolled in CIF member schools must "meet all standards of athletic eligibility established by CIF, their respective CIF Section of membership, their respective league, district, and school to be considered a student in good standing and eligible to compete for their school of enrollment."

57.    One of CIF's required standards of athletic eligibility is "Residential Eligibility," set out in CIF Bylaw 206.  Student-athletes acquire residential eligibility either upon initial enrollment in a CIF member school as a 9th grader, or upon a "valid change of residence" from one public high school's attendance area to another.  CIF Bylaw 206(A), (C).  "For athletic eligibility purposes, a student" and the students' parents, guardians, or caregivers "may have only one (1) primary valid residence at one (1) time."  CIF Bylaw 206(C)(3).  "A valid change of residence for eligibility purposes requires the former residence to have been vacated by the entire family for use as its residence." *Id.*

58.     CIF's bylaws impose additional, highly burdensome restrictions on what
constitutes a valid change of residence.  "The original residence must be abandoned as a
residence by the immediate family.  The new school is responsible for validating this fact;
AND . . . [t]he student's entire immediate family must make the change of primary residence and
take with them the household goods and furniture appropriate to the circumstances.  For
eligibility purposes, a family unit may not maintain more than one (1) primary residence;
AND . . . [t]he change of primary residence must be genuine, without fraud or deceit and with
permanent intent; AND . . .[a] request for eligibility based on a valid change of residence by the
student's entire immediate family must be supported by documentation."  CIF Bylaw 206(C)(4).
After listing types of documentation that can serve as evidence, the CIF bylaws state that "[t]he
Section Commissioner and/or school have the discretion to request additional documents that
he/she deems necessary to confirm residency."  *Id.*

59.     Even if a student has otherwise complied with CIF's rules in completing a "valid
change of residence," that change can be invalidated if CIF determines that the change was
"athletically motivated."  CIF Bylaw 206(C)(10) states that "[i]f a student completes a valid
change of residence" in accordance with CIF bylaws, "a student may not be eligible to
participate at any level if there is evidence that the move was athletically motivated or the
student enrolled in that school in whole or in part for athletic reasons."  A note added to the CIF
bylaws in April 2017 explains that "[b]ased on the CIF philosophy that students attend school to
receive an education first; athletic participation is secondary . . ., individual Section Offices may
limit eligibility for a student when there is evidence the transfer, or move is made to acquire
athletic participation" at the transferee school.  *Id.*

60.     Under CIF bylaws, "evidence of an athletically motivated move may include, but
is not limited to: Transferring to a School after Participating on a Non-School Athletic Team,
Camp, or clinic Associated with the School . . ., Transferring to a School Where a Former High
School Coach Has Relocated . . ., A demonstrated move or transfer that is prompted by an
association with club programs or outside agencies that use the facilities of the new school[, and]

Evidence that multiple students have transferred or changed schools to participate in a particular sports program at one (1) school."  *Q&A*, CIF Bylaw 206(C)(10).

61.    CIF's "Transfer Eligibility" guidelines in Bylaw 207 govern the eligibility of students seeking to transfer between CIF member schools without having made a "valid change of residence" under Bylaw 206.  *See* CIF Bylaw 207(B).  In order to effectuate the CIF's goal of functioning as a "deterrent to students who transfer schools for athletic reasons and to individuals who recruit student-athletes," CIF Bylaw 200(A)(7), the requirements of Bylaw 207 for student-athletes and CIF member schools seeking transfer eligibility without a valid change of residence are even more restrictive and burdensome than the requirements of Bylaw 206 governing valid changes of residence.

62.    Transfer students addressed in Bylaw 207 "must complete the respective CIF Section-required application form . . . [which] must be submitted to the CIF Section for an eligibility determination . . . .  No transfer student is eligible to compete for their new school of enrollment until a determination has been made by their respective CIF Section."  CIF Bylaw 207(B)(1).  The student, their parents or guardians, and the school must also disclose "[a]ny and all pre-enrollment contact of any kind whatsoever with a student" to "their respective CIF Section office on a completed CIF Pre-Enrollment Contact Affidavit."  CIF Bylaw 207(B)(2).

63.    "Pre-enrollment contact may include, but is not limited to: any communication of any kind, directly or indirectly, with the student, parent(s)/guardian(s)/caregiver, relatives, or friends of the student about the athletic programs at the school; orientation/information programs, shadowing programs; attendance at outside athletic or similar events by anyone associated with the school to observe the student; participation by the student in programs supervised by the school or its associates before enrollment in the school . . . ."  *Id.*

64.    "The principal and athletic director" of the transferor school "shall attest that to the best of their knowledge they have no credible evidence of any person: who is connected with the athletic department" of the transferee school, "who is part of the booster club" of the transferee school," "or who is acting on their behalf, having communication, directly or

1  indirectly, through intermediaries or otherwise, with the transfer student, student's

2  parent(s)/guardian(s)/caregiver, or anyone acting on behalf of the student, prior to the completion

3  of the enrollment process."  CIF Bylaw 207(C)(2).  "The principal, athletic director, and head

4  coach" at the transferee school must also "certify that to the best of their knowledge" the same is

5  true.  CIF Bylaw 207(C)(3).

6      65.    The penalties associated with transferring between CIF member schools without a

7  valid change of residence are particularly harsh.  Students transferring for the first time since

8  their initial enrollment in the 9th grade (or due to a valid change of residence or an approved CIF

9  hardship) are obligated to "remain out of any competition at any level in each sport in which they

10  competed in the last 12 months at the former school" for "50% of the total number of days in that

11  particular season of sport," known as the "Sit Out Period."  CIF Bylaw 200(B)(5)(b)(ix).

12      66.    The penalties become even harsher when students are suspected of having

13  athletically motivated reasons for requesting transfer.  CIF Bylaw 510 sets out in full the CIF

14  restrictions on the types of activities it deems "Undue Influence, Pre-Enrollment Contact, Failure

15  to Disclose Pre-enrollment Contact and Athletically Motivated Transfers."  "Undue influence is

16  any act, gesture, or communication (including accepting material or financial inducement to

17  attend a CIF member school for the purpose of engaging in CIF competition regardless of the

18  source) which is performed personally, or through another, which may be objectively seen as an

19  inducement, or part of a process of inducing a student, or his or her

20  parent(s)/guardian(s)/caregiver, by or on behalf of, a member school, to enroll in, transfer to, or

21  remain in, a particular school for athletic purposes."  CIF Bylaw 510(A).

22      67.    The negative consequences of engaging in "undue influence" fall primarily on

23  CIF student-athletes and member schools: "The use of undue influence by any person(s) to

24  secure or retain a student or their parent(s)/guardian(s)/caregiver as residents may cause the

25  student to be ineligible for high school athletics for a period of one (1) year and shall jeopardize

26  the standing of that high school in the CIF."  *Id.*  "CIF Bylaws provide for individual Section

27

Offices to limit eligibility for a student when there is evidence the transfer, or move is made to acquire athletic participation at their new school."  CIF Bylaw 510(E).

68.    The restrictions against "undue influence" also prohibit student-athletes' receipt of compensation in exchange for their decision to play for a particular CIF member school: "A student shall become ineligible for CIF competition for a period of one (1) year for accepting material or financial inducement to attend a CIF member school for the purpose of engaging in CIF competition, regardless of the source.  This includes, but is not limited to, student individual endorsements that involve anyone from, or associated with . . . a school or its athletic programs." CIF Bylaw 510(B).

69.    As when a student seeks eligibility after a valid change of residence under Bylaw 206, students seeking transfer eligibility under Bylaw 207 are required to "submit a completed CIF Pre-Enrollment Contact Affidavit" to report "[a]ny and all pre-enrollment contact of any kind whatsoever that a student or anyone associated with the student has had with a person associated with the new school . . . ."  CIF Bylaw 510(D)(1).

70.    CIF's definition of "Being Associated with a School" is expansive: "Persons associated with a school include, but are not limited to, current or former coaches, current or former athletes, parent(s)/guardian(s)/caregiver of current or former student/athletes, booster club members, alumni, spouses or relatives of coaches, teachers and other employees, coaches who become employed, active applicants for coaching positions, and persons who are employed by companies or organizations that have donated athletic supplies, equipment or apparel to that school, any organization that assists or consults with a family/student resulting in enrollment and/or retention at a specific school for financial or athletic purposes."  CIF Bylaw 510(D)(2).

71.    In certain instances, CIF shifts the burden of proof regarding the motivation for transfer onto student-athletes by deeming several circumstances surrounding a request to transfer to constitute prima facie evidence that the transfer was athletically motivated.  For instance, if "[t]he student at any grade level transfers to a new school within one (1) calendar year of the relocation of his/her school or club coach to the student's new school of enrollment," CIF Bylaw

510(E)(2), then the student "may be determined by their respective CIF/Section Office or the CIF to have made an athletically motivated transfer." CIF Bylaw 510(E).

72.     Similarly, if a student requests transfer (with or without a valid change of residence) to "any CIF member high school where the student participated, during the previous 24 months, on a non-school athletic team (i.e. AAU, American Legion, club team, etc.) that is associated with the new school" that previous club-team association "shall be considered prima facie evidence (sufficient evidence) of undue influence/recruiting by the school to which the student transfers. Such transfer may be considered prima facie evidence (sufficient evidence) that the student enrolled in that school in whole or in part for athletic reasons." CIF Bylaw 207(C)(4). "When a prima facie case (sufficient evidence) of undue influencing/recruiting exists, the student shall be ineligible to represent the new school in interscholastic athletic competition for a period of one (1) calendar year from the date of the student's enrollment in the new school in all sports in which the student participated at any school in the last 12 months" unless "sufficient proof is presented to the satisfaction of the Section Commissioner that rebuts or disproves the evidence of undue influence/recruiting for athletic reasons." *Id.*

73.     "Other factors that may be considered in support of evidence of athletic motivation" include "[e]vidence the student's transfer or change of school is because of the student's previous association with an outside agency that uses the facilities or personnel of the student's new school," or "[e]vidence that multiple students have transferred or changed schools to participate in a particular sports program at one (1) school." CIF Bylaw 510(E)(3).

74.     Each of the Section Defendants is required to adopt and enforce CIF's anticompetitive restrictions on transfers and recruiting. Additionally, CIF's rules expressly empower the Section Defendants to limit a student's eligibility when there is evidence that a transfer or move was made to acquire athletic participation at the new school. *See* CIF Bylaw 510(E). The Section Defendants are empowered by CIF to make the initial determination of whether Bylaw 510 (concerning "Undue Influence, Pre-Enrollment Contact, Failure to Disclose Pre-enrollment Contact and Athletically Motivated Transfers") has been violated, and "an appeal

of a Section's decision to grant limited transfer eligibility" can be reviewed only by CIF.  CIF Bylaw 1100.  This means the Section Defendants play an integral role in enforcing CIF's statewide transfer and recruiting restrictions.

75.    Collectively, CIF and the Section Defendants' anticompetitive restrictions flatly prohibiting athletically motivated transfers and recruiting achieve exactly the effect that CIF expressly intends them to: they "[s]erve as a deterrent to students who transfer schools for athletic reasons and to individuals who recruit student-athletes."  CIF Bylaw 200(A)(7).  As discussed in more detail below, these anticompetitive restrictions reduce if not eliminate competition among high schools for student-athletes, which diminishes the incentive each high school would otherwise have to attract talented athletes, such as by offering scholarships or other educational support, NIL revenue sharing opportunities, greater investment in athletic programs, and so on.  This prevents the emergence of a competitive market for student-athletes' athletic labor among CIF member schools.

### C.    CIF Rules Limiting NIL Compensation

76.    Other CIF rules unfairly and anticompetitively limit the ability of CIF student-athletes to profit from the use of their name, image, and likeness in broadcasts of their athletic performances and other sports data and marketing-related products and services.

77.    Unlike some other states' interscholastic athletic associations, CIF does not enforce a blanket ban on student-athletes' ability to profit from licensing the use of their names, images, and likenesses to third-party sponsors or affiliates ("third-party NIL").  CIF bylaws permit student athletes to monetize their third-party NIL, "provided there is no school team or school affiliation" or affiliation with "a league, CIF Section(s), or CIF State," and that students are not "[w]earing a school team uniform or any identifying school insignia."  CIF Bylaws 212(C)(3)-(4).  Since at least 2021, CIF and its Sections and member schools have interpreted this rule to permit student-athletes to earn money from third parties for the use of their NIL, so long as any resulting endorsements and advertising content are not recorded on school property,

do not show the student in their athletic uniform or school-branded attire, and do not make use of the school or team name or other identifying marks.

78.    Beyond this relatively narrow grant of permission for student-athletes to monetize their non-school-affiliated third-party NIL, CIF strictly limits the ability of student-athletes to recoup any of the additional value of their NIL.  At the same time, as discussed in more detail below, CIF, its Sections,  CIF member schools, and their media partners profit from student-athletes' NIL through the monetization of (1) athletic website design, (2) broadcasting and streaming, (3) concessions, (4) coaching tools and analytics, (5) digital ticketing, (6) fundraising, (7) schedules, stats and scores, and (8) sponsorships.  Each of these revenue streams relies on the value of CIF student-athletes' NIL, but CIF, its Sections,  CIF member schools, and their media partners have collaborated to fix the price for their use of students' NIL through these revenue streams at zero, so that they can redirect the value of students' NIL to themselves.

79.    This unlawful price-fixing is accomplished in part through CIF's limits on athlete compensation for participation in athletic events described above.

80.    Other CIF rules centralize the authority to form commercial partnerships to profit from student-athletes' NIL in CIF, its Sections, and its member schools, rather than with student-athletes or student-athlete collectives.  In 2017, CIF issued "The CIF Advertising and Promotional Guidelines" intended to "assist member schools with the interpretation of Bylaw 510 [Undue Influence] in the areas of advertising and promotion of schools and districts."  The Guidelines assume that only CIF member schools can profit from commercial sponsorships, stating that "[c]ommercial relationships should be continually monitored to ensure against inappropriate exploitation of the school's name or reputation.  There should be no undue influence of commercial interests.  In addition, sports programs must be prudent, avoiding undue dependency on particular companies or sponsors."  CIF reserved the right to "review and determine if any advertisement or associated activities violate" certain minimum principles concerning "advertisements associated with CIF member schools."  *Id.*  On social media, CIF

member schools are expressly permitted to "post results, accolades, . . . celebrate student achievements, promote high school camps, clinics, and other on campus opportunities." *Id.*

81.    Additionally, schools are prohibited from sharing the revenue they earn from the licensing of student-athletes' NIL by CIF rules prohibiting member schools from distributing money received from third parties to individual athletes. CIF's Financial Principals and Audit Policy states that "all funds handled by the California Interscholastic Federation, or any of the CIF entities, are monies designed for the enhancement and administration of athletics for the students of the high schools in California." CIF Financial Principles and Audit Policy § 1. And CIF Bylaw 22(B)(7) requires, as a condition of CIF membership, that "CIF member schools will not accept monies, equipment or apparel specific to, or distributed to, individual athlete(s) within that program. All gifts are school property . . . and may not be given to any individual athlete(s). School/school districts should ensure that such gifts are distributed equitably."

82.    In addition, various CIF Sections maintain their own rules to ensure that student-athletes are not able to receive a share of the revenue that CIF, its Sections, CIF member schools, and their media partners receive from the use of student-athletes' NIL. For instance, CIF-LA Bylaw 1313 states, "All playoff and championship events are the exclusive property rights of the CIF Los Angeles City Section and approval for all radio, webcast or video/televised broadcast must have the prior approval of the Section Commissioner and Section broadcast/webcast sponsor." CIF-North Coast's Reimbursement Guidelines require that "[t]he NCS office must approve broadcast/streaming of ALL NCS Championship Events." Similarly, CIF-San Diego requires that "Filming or streaming of any CIFSDS playoff or championship event is only permitted with prior approval from the San Diego Section Office." See CIF-San Diego Bylaws, Article XII.

83.    CIF-Southern Bylaw 3509 states that "[t]he Commissioner [of CIF-Southern] shall set the fee to be charged for the right to broadcast or telecast any playoff contest." Rule 149 of the CIF-Southern Financial Policy states, "It shall be the responsibility of the Commissioner of Athletics [of CIF-Southern] to negotiate, set the rights fee to telecast and

contract any content hosted by a Southern Section member school that will be broadcast on a regional or national basis via an over-the-air station, cable outlet made available to multiple cable service providers, internet, or satellite transmitted station, outlet, or programming network." As a Q&A section for that rule explains, CIF-Southern's "video rights are structured similar to college conferences. All rights for varsity regular season and playoff games are contracted through the CIF-SS office. 100% of regular season rights fees are distributed back to the 'host/home' school of the game being broadcast. Playoff revenues remain with the CIF-SS office . . . ." If a CIF member school seeks to distribute a varsity game through a third-party website, CIF-Southern rules "require a full rights fee regardless of who is doing the production. Any distribution through a site or station other than the official school owned web site or station requires a fee. Distribution point determines fee regardless of who is producing the game."

84.     Collectively, these rules and regulations forbid CIF member schools or CIF Sections from sharing the revenue they receive by licensing their student-athletes' NIL with those very student-athletes, artificially fixing the price student-athletes are compensated for their NIL at zero. CIF, its Sections, CIF member schools, and their media partners are therefore unfairly and unlawfully able to retain the entire amount of revenue they derive from licensing student-athletes' NIL through various revenue streams, including broadcast licensing and collaborations with sports data and marketing platforms, as described in more detail below.

### D.    CIF Rules Mandating Section and Member School Adherence

85.     The governing body of CIF, the Federated Council, is empowered by the CIF Constitution to "[e]xercise jurisdiction over all interscholastic athletic games, events and meets involving CIF member schools." CIF Bylaw 34(B). Accordingly, all authority possessed by CIF Sections is delegated by the Federated Council: "The Federated Council delegates jurisdiction to each CIF Section for all interscholastic athletic games, events and meets in which only CIF member schools of that particular Section participate." *Id.*

86.     The Federated Council is empowered to "[p]rescribe ways and means by which standards of eligibility shall be met." CIF Bylaw 34(F). The Federated Council is also

empowered by the CIF Constitution to "[e]stablish and enforce penalties for any violation of the Constitution and Bylaws or other rules of the Federation. Schools, leagues, and Sections may establish and enforce penalties, provided that such penalties are not in conflict with penalties that have been established by higher authority." CIF Bylaw 34(D).

87.    Article 2, Section 22 of CIF's Constitution provides that "[a]s a condition of membership and continuing membership a member school agrees to: . . . (2) To abide by all current rules and regulations of the CIF State and CIF Section."

88.    Article 2, Section 23 of CIF's Constitution confirms that "[t]his Constitution and Bylaws is binding on all schools, leagues and Sections." While "[a] school, league or Section may enact regulations which are more stringent than those adopted by a higher authority," CIF Sections, leagues, and member schools lack the ability to relax or decline to enforce any CIF rules. *Id.*

89.    Any CIF member school that deviates from CIF rules may be subject to severe sanctions. CIF and CIF Section leadership "shall have the power to suspend, to fine or otherwise penalize any member school for the violation of any CIF or Section rules and regulations or for just cause. The period of suspension or other penalty shall be left to the discretion of the CIF governing body that has jurisdiction of the matter where the penalty is not fixed." CIF Bylaw 22(C)(1). The penalties can include threats of suspension or expulsion of schools from CIF membership. For instance, CIF Bylaw 510(A) states that a violation of its prohibitions against undue influence to recruit student-athletes "shall jeopardize the standing of that high school in the CIF."

90.    Accordingly, CIF Sections and CIF member schools are not free to deviate from CIF Bylaws but are instead required to adopt and enforce them in their entirety. This mandated complicity with CIF's anticompetitive rules and regulations turns the Section Defendants and CIF member schools into active participants in the CIF's unlawful cartel.

## V.    RELEVANT MARKETS

### A.    The California High School Athletic Labor Market

91.    The first relevant market is the statewide market for the athletic labor of CIF high school student-athletes in the various sports in which they compete (the California High School Athletic Labor Market), in which each sport can be considered an independent submarket.  In California's High School Athletic Labor Market, athletes compete to participate on particular California high schools' athletic teams.  Member schools compete, and have the potential to compete, to recruit and retain the best players through various strategies.

92.    The size of the California High School Athletic Labor Market is currently heavily suppressed by CIF's anticompetitive restrictions on compensation for athletic labor, transfers for athletic reasons, and recruiting.  Nevertheless, it is clear that this market already exists and would expand significantly in the absence of the challenged restrictions.  The very existence of a strict regime of rules and regulations prohibiting recruiting and transfers indicates that strong demand exists among high schools to recruit student-athletes, and among student-athletes to transfer schools for athletic reasons.

93.    According to Karissa Niehoff, executive director of the National Federation of State High School Associations, "We're seeing our state associations dealing with literally hundreds of transfer waiver requests.  California had 17,000 transfers last year. . . .  You're seeing kids that want to move schools, following coaches, a lot of trying to get around the rules.  Some of it is NIL induced."  In the 2023-24 academic year, 64 transfers were reportedly denied for violation of CIF Bylaw 510 against undue influence.  That number does not capture the number of students who are deterred by CIF rules from even pursuing an athletically motivated transfer.

94.    Additionally, according to Niehoff, even at the high school level, NIL collectives are "popping up left and right. . . .  They're outside of the school.  And there are a number of them now that profess to be the best at advising parents and getting kids connected, developing the potential of their NIL and assuring them a safe, positive experience.  One of the latest things

1  that we're seeing is what I'll call the booster club imposter, where anybody can join and name

2  the team that you want to support, offer some money.  You can name a student athlete that you

3  want to support."  Niehoff also commented that "[h]igh school NIL collectives are currently ill-

4  defined and not monitored for quality."

5       95.     News reporting and CIF disciplinary actions have revealed other routine and high-

6  profile violations of CIF's rules against recruiting, athletically motivated transfers, and

7  compensation for athletic labor.  For example, in April 2025, Narbonne High School was

8  stripped by CIF of its Los Angeles City Section championship after findings that the school had

9  violated CIF Bylaw 510 by recruiting student-athletes, compensating them with "tens of

10  thousands of dollars" and housing arrangements, and failing to report this pre-enrollment contact

11  to CIF during the 2024-25 football season.  The CIF investigation came after an entire league of

12  CIF schools boycotted Narbonne for suspected recruiting violations.  One of the boycotting

13  coaches, commenting on Narbonne's recruiting practices, stated "I don't have a problem with

14  transfers.  We have transfers.  Everyone wants their program to draw talent, but when there's

15  monetary incentive and housing arrangements going on[, i]t has to stop."  The boycotting

16  coaches stated in a letter to CIF-LA that "[a]s you are aware, there have been persistent concerns

17  for roughly a decade concerning Narbonne's recruitment practices."  The letter stated that

18  "Narbonne has had over 20 transfers since last season," including some players who were "flown

19  in from out of state to join an already stacked roster," "further supporting concerns about their

20  recruitment practices."  The letter also stated that "[w]e have seen this before: in the early 2010s,

21  similar recruitment issues surrounded Sierra Canyon, leading to a boycott by several schools in

22  their league."  Thus, when there are occasional violations of CIF's anticompetitive rules, the

23  cartel mobilizes to punish the violators and to reinforce the anticompetitive regulations.

24       96.     For parents who have the resources to move their households to a new school

25  district, or for particularly promising high school student-athletes, transfers for athletic reasons

26  are common and even publicly acknowledged.  For instance,  Sierra Canyon High School's

27  basketball program "has been a basketball powerhouse on the California basketball scene,

churning out plenty of NBA players and college basketball stars." In 2019, the sons of

professional basketball stars LeBron James and Dwayne Wade transferred to Sierra Canyon.

According to one source, the motivation for the transfers was that "James and his wife,

Savannah, felt that Sierra Canyon would offer a better fit for basketball for their sons." More

recently, Sierra Canyon reported three "impact transfer[s]" in summer 2024, adding "two 4-star

recruits, and a 3-star prospect" heading into the 2024-25 season.

97.     Even in the artificially limited market for student-athlete athletic labor that exists

despite CIF's anticompetitive restrictions, demand and competition for athletic labor begins even

while students are still in eighth grade. The existence of this market sometimes comes to light

when CIF punishes a school for violations of its undue influence rules. For instance, in 2015, the

Modesto Christian High School baseball program was punished by CIF for illegal recruiting

when it offered discounts on tuition to an eighth grader in exchange for that student's

commitment to play baseball for Modesto Christian. As a result, the student-athlete was

ineligible for all CIF competition during the entire 2015-16 school year. Modesto Christian's

varsity baseball program was required to forfeit all games won during the 2014-15 school, was

ineligible for playoffs during the 2015-16 school year, and its entire baseball program schedule

was reduced from a maximum of 27 games to 25 games for the 2015-2016 and 2016-17

school years. The program was also placed on probation for the 2015-16 and 2016-17 school

years, and the Modesto Christian baseball staff was required to attend the new athletic directors'

workshop on eligibility.

98.     Even further back in time, Franklin High School in the Stockton Unified School

District, within CIF-Sac-Joaquin, was found to have illegally recruited 14 high-school football

players from American Samoa between 2004 and 2007. According to the CIF investigation, "the

student-athletes were promised airfare and room and board by parties affiliated with the football

program in exchange for enrolling and playing football at Franklin. None of the students lived

with their parents while attending Franklin, instead staying with an assistant coach or brother of

the coach." The Franklin High School football coach resigned in 2016 following the controversy.

99.     Because CIF relies on schools to self-report violations, it is likely that many violations of the CIF's restrictions on recruiting and athletically motivated transfers go unreported and undetected. Nevertheless, the existence of "illicit" instances of recruiting, athletically motivated transfers, and compensation for student-athletes' athletic labor demonstrates that, but for CIF's anticompetitive rules, high schools would compete with one another in a competitive market for California High School Athletic Labor. In this market, student-athletes compete to sell their athletic labor to particular California high schools' athletic teams, while CIF member schools compete to recruit and retain the best players through various strategies. If CIF's anticompetitive restrictions on recruiting, athletically motivated transfers, and compensation for athletic labor were eliminated, this market would expand dramatically.

100.     In the absence of the challenged restrictions, all CIF member schools would compete in the relevant labor markets. California private schools would compete by, among other things, actively seeking talented athletes from outside their geographic areas and offering financial aid or scholarships to make tuition more affordable, or by offering participation in private, high-performing sports leagues or training programs. Public schools would compete by, among other things, maintaining open enrollment policies and larger student bodies, allowing them to offer student-athletes a larger pool of athletic talent, high-performing teammates, and a greater number of teams and sports. Both private and public schools would compete by investing in their sports programs, building modern sports facilities, providing high-quality sports equipment, hiring talented or high-profile coaches, providing exposure to college recruiters, and offering compensation for the use of student-athletes' NIL, among other tangible and intangible packages of goods and services.

101.     In exchange, student-athletes and their families would select which high school to attend or transfer to and agree to provide their athletic labor and acquiesce in the use of their

NILs by CIF, CIF Sections, member schools, and media partners for commercial and promotional purposes.

102.    CIF, its Sections, member schools, and media partners have the ability to control price and exclude competition in these labor markets.  CIF, its Sections, member schools, and media partners work together to adopt and enforce the challenged anticompetitive restrictions on compensation for athlete labor, transfer eligibility, and recruiting.  All CIF members schools have agreed to abide by CIF's constitution, bylaws, and other regulations.  CIF has the power to exclude any member who is found to violate its rules from these markets.

103.    If students had the opportunity to compete in California high school interscholastic athletics without these anticompetitive restrictions on their ability to transfer for athletic reasons and receive compensation for their athletic labor, many would choose to do so. That they instead submit to CIF's rules and regulations demonstrates the market power that CIF and each of its members has in the relevant labor markets.

104.    There are no reasonable substitutes for the educational and athletic opportunities provided by CIF member schools in the relevant labor markets.  No other association in California provides the same combination of goods and services offered by member schools in the CIF ecosystem.  The NCAA and other major college athletic associations limit membership to student-athletes who have graduated high school, so student-athletes that have not yet completed high school cannot sell their labor to college-level athletic associations or member colleges.  The National Football League requires players to have been out of high school for at least three years in order to be eligible to play.  Meanwhile, the National Basketball Association limits eligibility to players 19 years of age or older who have been out of high school for at least one year.  Additionally, CIF student-athletes are categorically forbidden from participating in intercollegiate athletic contests; any student athlete who competes in an intercollegiate athletic contest "shall be ineligible for high school participation in that sport for the duration of the student's high school enrollment."  CIF Bylaw 215, *see also* CIF Bylaw 702(C) and associated Q&A.  Additionally, "[a] student shall become ineligible for CIF competition if he/she

participates in any tryout for a professional team in any CIF-approved sport during the high school season of sport." CIF Bylaw 605.  Further, while some athletic programs exist which are not affiliated with schools, such as club teams, they are not reasonable substitutes for CIF participation because, among other things, they lack comparable access to collegiate recruitment networks and state championships.

105.    Because CIF member schools are the only purchasers in the relevant labor markets, they have the power, when acting in concert through CIF and its Sections and Leagues, to fix the quantity and price of labor.  They have chosen to exercise this power by enacting horizontal rules that strictly limit the compensation and terms of employment for CIF athletes.  If any school seeks to depart from these rules, those schools risk sanction or expulsion by CIF.

106.    The Section Defendants', CIF member schools', and Media Defendants' agreement to abide by CIF's compensation rules is anticompetitive because it undermines schools' efforts and ability to compete freely for the best athletes.  Absent these anticompetitive restraints, there would have been free and vigorous competition for the athletic labor of California high school student-athletes.  CIF member schools, Leagues, Sections, and CIF itself would have to compete to offer students fair compensation for their athletic labor.

**B.    The California High School Student-Athlete NIL Market**

107.    The second relevant market is the national market for the use of California high school student-athletes' names, images, and likenesses for commercial and promotional purposes, including in live or prerecorded broadcasts of athletic competitions (Broadcast Name, Image, and Likeness, or BNIL) and in sports data and marketing software.  Currently, CIF rules prevent student-athletes from receiving compensation for their BNIL and school-affiliated NIL, which eliminates any incentive for CIF member schools, CIF Sections, and partners like the Media Defendants to compete to share their revenues from students' NIL with the relevant student-athletes.

108.    In the absence of the challenged restraints, market-based competition would have led student-athletes to receive, among other things, a share of revenues for the group licensing of

their NIL and BNIL.  These athletes would be able to offer group licenses for the use of their NIL to their schools, which could in turn package them in League- or Section-wide NIL licenses for sale to broadcast companies or sports data and marketing companies.  In turn, if CIF's anticompetitive restraints on student-athlete NIL compensation were removed, CIF member schools, Sections, and media partners would then have to compete to compensate their student-athletes with a share of revenues that the Sections and CIF member schools receive from their broadcast, sports data, and sports marketing partnerships.

109.    The Section Defendants', CIF member schools', and the Media Defendants' agreement to abide by CIF's compensation rules is anticompetitive because it undermines athletes' ability to profit from the fair market value of their NIL.  Absent these anticompetitive restraints, there would have been free and vigorous competition for the NIL of California high school student-athletes. CIF member schools, Leagues, Sections, the Media Defendants, and CIF itself would have to compete to offer student-athletes fair compensation for their NIL.

## VI.    FACTUAL ALLEGATIONS

### A.    High School Sports Are a Booming Industry

110.    High school sports are already a multibillion-dollar industry.  In the 2023 to 2024 academic year, more than 8 million student-athletes nationwide competed in high school sports, including approximately 4.6 million boys and 3.4 million girls.  According to Braly Keller, director of NIL and business insights at Opendorse, an NIL tech platform, "When you look at the sheer volume of [high school] athletes, they are 14 [times] the number that play in the collegiate ranks.  You're talking about a much larger pool, and 95 percent of famous athletes in the collegiate pool are ones that come from American high schools."

111.    The Aspen Institute estimated that U.S. families spend up to $40 billion annually on their children's sports activities, which is more than the annual revenues of any professional league.  "The $40 billion now spent by families on youth sports is twice the amount of cash flowing through the NFL, the most lucrative sports league in the world, and does not include the public spend by schools and municipalities, or that of private facility operators and sponsors."

According to a different Aspen Institute study, the size of the youth sports industry as a whole "is much harder to calculate," as it includes "spending by government, philanthropy and the private sector." "In aggregate, the total size of the youth sports economy is likely much higher than $40 billion."

112.    An industry analysis from 2022 notes that "[h]igh school sports has become big business over the last decade," as a result of "advancements in technology and shifts in consumer behavior." According to the analysis, "[h]igh school sports championships [were] historically . . . under-monetized because the state associations putting them on have not dedicated the resources needed to pursue large-scale commercial opportunities." The lack of centralized multimedia rights management and negotiation meant that high school administrators were responsible for any negotiations on behalf of their individual schools, resulting in local brands occupying the field and keeping revenues low.

113.    The high school athletics broadcasting and streaming market began to change in or around 2011 with the introduction of the outsourced, centralized model of multimedia rights management that was already in common use at the professional and collegiate levels. Outfront Media, a spin-off from the CBS corporate family formerly known as CBS Outdoor Sports, was an early mover in the high-school broadcast rights space when, in 2011, it "bought the web, app, local linear and radio broadcast rights, and the corresponding commercial assets and inventory to Arizona's state championships. The media company subsequently engaged in a process to identify and bring in sponsors, involve community outreach programs and invest in various technologies that a high school program may not have" (alterations omitted). Over the following years, other companies, including Defendants PlayFly, NFHS Network, Spectrum, and others entered the market. The resulting centralization of broadcasting and streaming rights among a few companies made it easier "for regional and national brands to make large advertising buys" and dramatically increased the amount of advertiser money flowing into high school athletics.

114.    Additionally, according to one industry expert, "[t]ech innovation has played a critical role" in increasing the monetization of high school athletics. Digital advertising, data

collection, and streaming technology have enabled a wide and growing variety of potential revenue streams for high school athletic programs and state athletic associations, including the sale of broadcast and streaming rights, partnerships with sports data and marketing companies, naming rights, corporate sponsorships and advertising placements, booster clubs, fees charged directly to student-athletes, and crowdfunding.  "Individual high schools all the way up to state associations now have more proficient websites, apps and social media channels, and are able to reach their fans with more frequency and engagement in ways that did not exist 10-plus years ago . . . .  In addition, nearly half of the high schools in the country now stream their events through the National Federation of State High Schools Association (NFHS) Network, which includes almost all sports and activities that a school offers across all grade levels."

115.     Discussing the market for high school athletic broadcast rights in 2017, David Rudolph, then president of Defendant PlayOn, stated that "[a]nnual attendance for high school sports is a little more than 450 million.  Audience growth was 35 percent last year.  That's a big market."  Mike Schreiber, the CEO of Playfly Sports, the second largest holder of collegiate multimedia rights, observed that "the ongoing change in high school sports resembles the progression he witnessed at the college level—'the next wave of college sports is high-end high school sports.'"  Indeed, for the 2024-25 season, ESPN aired 31 high school basketball games on its national network.

116.     According to a report by the National Association of Secondary School Principals, "High schools have also begun following the lead of professional sports stadiums by offering naming rights.  Josh Boyd, a Purdue University professor specializing in sports financing, says that such arrangements boomed in professional sports in the late 1990s and in colleges around 2005, and have become popular in high schools in the last five years."

117.     Increased consumer demand is also driven by increasing specialization of student-athletes on a limited number of sports at progressively younger ages.  According to an Aspen Institute study, "[a]s the youth sports industry encourages families to focus their children on a limited number of sports, the total number of sports that each child plays annually has declined,

from an average of 2.23 sports in 2008 to 1.63 in 2023 (Sports & Fitness Industry Association, 2023). . . .  The longer term decline bears implications for sports leagues and media companies, as research shows people who participated in an organized sport are three times more likely to become an avid fan of that sport (researcher Rich Luker, 2017)."

118.    These changes "have driven state [interscholastic athletic] association revenues steadily up and to the right with no signs of abating."  According to one industry expert, "[b]rands are willing to pay more to reach more people, particularly now that they have better data and a greater understanding of how high school sports maintains deep reach into local communities."

119.    Some industry experts have looked to the recent changes in the NIL monetization and transfer rules at the collegiate student-athlete level (discussed in more detail below) as indicators of the parallel untapped potential of a market for high school student-athletes' NIL. The estimated value of the collegiate athletic NIL market in 2025 will exceed $2.5 billion.  But in a 2025 interview, a leading expert on sports economics at Stanford University, Roger Noll, stated, "Think all this talk about college sports is big? . . . [high school sports are] a whole other world 10 times as big as college athletics."

**B.    CIF, the Section Defendants, and the Media Defendants Already Profit from Student-Athletes' Labor and NIL**

120.    Although CIF and its Sections hold themselves out as amateur athletic associations focused on educational values, they actively engage in commercial activities that generate millions of dollars annually.  CIF and its Sections license the broadcast and streaming of high school athletic events; sell photo and video content; operate ticketed games and events; enter exclusive marketing, sponsorship, and advertising deals; and license the use of school and event branding for merchandise.  These revenue-generating activities are directly tied to the athletic performances, identities, and public appeal of high school student-athletes.

121.    CIF's marketing revenue far outpaces its marketing expenditures annually, leaving a handsome profit.  The following chart shows CIF's marketing income versus expenses annually since 2016.  In the 2025-26 academic year, CIF earned over a million dollars in profit from its marketing activities.



122.    As CIF's own marketing profits demonstrate, the potential market for NIL in California high school athletics is large.  An executive at Defendant Playfly, Chuck Schmidt, observed that California has "900,000-plus high school athletes, and when you add their family members, you're talking about three million plus people every year engaged in high school athletics."

123.    A large portion of CIF and its Sections' marketing revenues come from its sale of broadcast rights.  According to the CIF State Media Policies Reference Guide, CIF has jurisdiction over radio, television, cable, and Internet policies related to transmissions during CIF Regional and State Championship events.  The local Sections retain jurisdiction over regular

season and Section-level radio, television, cable, or Internet transmissions of high school interscholastic competition.  CIF State charges fees and controls the number of credentials available to media personnel for the Regional and State Championship events within its jurisdiction, and local CIF Sections, schools, and participating teams charge fees and control credentials available for regular-season and Section-level events within their respective jurisdictions.

124.    According to the CIF State Media Policies Reference Guide, CIF holds itself and its "exclusive rights partners" out as the owners of "the rights to all commercial use of video, audio, or textual play-by-play transmitted at a CIF Regional or State Championship event," stating that transmission rights fees for Regional and State Championship events "are to be made payable to the CIF."

125.    CIF State forms exclusive partnerships in which it sells the use of student-athletes' NIL to third-party organizations.  For example, the CIF State Media Policies Reference Guide states that "Spectrum holds the exclusive television broadcast rights to all CIF Regional and State Championships."  In 2012, Spectrum agreed to pay CIF State $8.5 million in exchange for a 15-year deal granting it exclusive television broadcast rights for interscholastic athletic events within CIF State's jurisdiction.  Under that contract, Spectrum paid CIF $550,000 in its first year, 2012, and has continued to pay CIF that amount plus a built-in increase of 4 percent

per year throughout the next 14 years of the contract.  The following chart, from CIF State

meeting minutes, shows the amount received by CIF through each year of the Spectrum contract.



### California Interscholastic Federation
2025-2026 CIF Broadcast Rights Income

| Spectrum Sports Network - Year 15 | | | |
|---|---|---|---|
| | Gross | Net | Change |
| 2011-2012 | $550,000.00 | $495,000.00 | |
| 2012-2013 | $572,000.00 | $514,800.00 | $19,800.00 |
| 2013-2014 | $594,880.00 | $535,392.00 | $20,592.00 |
| 2014-2015 | $618,675.20 | $556,807.68 | $21,415.68 |
| 2015-2016 | $643,422.21 | $572,645.77 | $15,838.09 |
| 2016-2017 | $669,159.10 | $595,551.60 | $22,905.83 |
| 2017-2018 | $695,925.46 | $626,332.91 | $30,781.32 |
| 2018-2019 | $723,762.48 | $651,386.23 | $25,053.32 |
| 2019-2020 | $752,712.98 | $677,441.68 | $26,055.45 |
| 2020-2021 | $782,821.50 | $704,539.35 | $27,097.67 |
| 2021-2022 | $814,134.36 | $732,720.92 | $28,181.57 |
| 2022-2023 | $846,699.73 | $762,029.76 | $29,308.84 |
| 2023-2024 | $880,567.72 | $792,510.95 | $30,481.19 |
| 2024-2025 | $915,790.43 | $824,211.39 | $31,700.44 |
| 2025-2026 | $952,422.05 | $857,179.84 | $32,968.46 |
| | $11,012,973.20 | $9,898,550.07 | $362,179.84 |

126.    In addition, CIF State and all ten Sections have a statewide marketing partnership

with Playfly, for which Playfly remits revenue annually to CIF State and all ten Sections.  This

partnership is currently in its ninth year, and provided over $1.4 million in marketing revenue to

CIF and its ten Sections.  The income breakdown for the 2025-26 year is shown below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14

## California Interscholastic Federation
### 2025-2026 State Marketing Income Overview

| PLAYFLY SECTION SPLIT - Year 9 ||
|---|---|
| **SECTION** | **TOTAL** |
| CENTRAL | $57,149.98 |
| CENTRAL COAST | $63,669.33 |
| LOS ANGELES CITY | $43,049.55 |
| OAKLAND | $4,588.06 |
| NORTH COAST | $84,997.40 |
| NORTHERN | $35,981.44 |
| SAC-JOAQUIN | $102,234.22 |
| SAN DIEGO | $91,672.98 |
| SAN FRANCISCO | $4,588.06 |
| SOUTHERN | $514,197.71 |
| STATE OFFICE | $415,426.71 |
| | **$1,417,555.44** |

15    127.    Additionally, CIF State and all ten Sections have an exclusive statewide digital

16  streaming partnership with NFHS Network.  An expanded partnership between CIF State and

17  NFHS Network was announced in 2019: "While the NFHS Network has had a longstanding

18  digital streaming agreement with the 10 CIF Sections, this marks the first time that all of the CIF

19  State level events will be available on the NFHS Network outside of Southern California.  In

20  Southern California, state football and basketball championships will air exclusively on

21  Spectrum Networks."  The multi-year partnership encompasses all regular-season games hosted

22  by all Sections, as well as many postseason events throughout the state.  On information and

23  belief, CIF and its Sections received significant compensation through this agreement.

24    128.    Approval to televise or audio broadcast any contest within CIF State's jurisdiction

25  must be granted by CIF State officials and "exclusive partners," which include Spectrum and

26  NFHS Network.  The CIF State Media Policies Reference Guide states that "[t]he sale or resale

27  of photography, digital image, videotape, or film by CIF-credentialed media using images from

CIF Regional or State Championship events is prohibited without written permission from the CIF and the payment of the applicable rights fees to the CIF State Office."

129.    CIF understands the immense value of California interscholastic athletics as a brand.  This is evidenced by the fact that it maintains a strict advertising policy to ensure its own "brand safety," a marketing term "that measures how well a brand is protected from being associated with inappropriate or offensive content."  CIF's advertising policy "strictly prohibits the sponsorship, advertising, selling, encouraging, promoting, or condoning of tobacco products, lottery/gambling, alcoholic beverages, mood-altering substances, lewd subject matter, activities that are illegal for minors to engage in, or conduct that people of ordinary intelligence would reasonably understand to be inappropriate in the context of interscholastic athletic competition."  To ensure adherence to its advertising policy, CIF "retains the right to require stations to submit in writing, upon CIF request, any and all advertisements or sponsorships during a radio, television, or internet transmission of Regional and State Championship competition," and "reserves the right to approve or reject any sponsorship or advertisement violative of these policies."

130.    On information and belief, CIF maintains a lucrative deal with Defendant Playfly, and works closely with Playfly employees to generate revenue from high school student-athletes' labor and NIL.  Playfly has recruited a "General Manager" who is "responsible for generating incremental sponsorship revenue on behalf of the California Interscholastic Federation (CIF) to meet and exceed individual and team goals for Playfly.  The person in this role will work with the CIF Executive Director, CIF Senior Staff, CIF Section Commissioners, and Playfly Sports Properties senior level staff to pitch and close enterprise partnership agreements."

131.    CIF also maintains a multi-year, lucrative partnership with Defendant GoFan "as the official digital ticketing partner to provide touchless, digital ticketing solutions to high schools and state-wide post-season play across California."  GoFan's press release on the most recent renewal of this partnership in 2021 stated, "GoFan is proud to renew our partnership with the CIF as the official digital ticketing partner across all 10 CIF sections, 1,606-member schools

and more than 838,000 students across California." On information and belief, Defendant GoFan, CIF, its Sections, and member schools agree to divide the revenues they receive from ticket sales, the value of which is highly contingent on student-athletes' athletic labor and NIL.

132.    CIF also maintains a multi-year contract with Defendant SBLive Sports as an "Official Digital Content Provider of the CIF and the 10 CIF Sections." In October 2023, CIF and SBLive announced a three-year agreement renewing an existing partnership for those same purposes. On information and belief, Defendant SBLive Sports, CIF, its Sections, and member schools agree to divide the revenues they receive from ticket sales, the value of which is derived from student-athletes' athletic labor and NIL.

133.    Some of the larger CIF Sections maintain their own parallel media policies and enter into similar exclusive broadcast and multimedia rights agreements. For example, CIF-Southern has partnered with NFHS Network to broadcast athletic events since 2013. In 2023, it entered an expanded six-year exclusive broadcast deal with NFHS Network, covering live and on-demand video streaming of CIF-SS playoff games, including championship contests, which are marketed using the names and likenesses of student-athletes. CIF-Southern also partners with Playfly Sports, a sports marketing firm, to manage and monetize media and sponsorship rights across hundreds of high schools. The other Section Defendants similarly authorize broadcasts, highlight reels, and branded media content, all of which are broadcast to NFHS Network subscribers statewide and nationwide.

134.    Even individual CIF member schools in California have signed their own broadcast deals. For instance, Mater Dei High School's renowned athletic program has purportedly signed a 10-year deal with Defendant PlayFly to help student athletes build the value of their NIL, for which the school earned over $1 million. Additionally, in 2019, Sierra Canyon High School became the first high school to receive national broadcast coverage when ESPN agreed to air fifteen of its boys basketball games at a time when the team included high school student-athletes Bronny James (son of NBA star LeBron James) and Zaire Wade (son of NBA star Dwayne Wade).

135.    These deals are part of a broader trend towards the commercialization of California high school sports.  As far back as 2012, an industry consultant, Lee Burke of LHB Sports, Entertainment & Media, analyzing the $8.5 million Spectrum-CIF television rights agreement, "insisted that the deal actually represented good value for [Spectrum] in the ever-competitive arena of burgeoning rights fees."  The consultant stated that "[h]igh school sports, particularly high school championships, is increasing [sic] because it's a valuable property for regional sports networks . . . .  It makes a lot of sense for them."

136.    This industry expert's intuitions concerning the markets for California high school student-athletes' labor and NIL are validated by the huge revenues accrued by CIF and its Sections, not to mention by their media partners.  According to ProPublica, CIF State brought in annual revenue over $9.4 million in 2024.  Additionally, the largest CIF section, CIF-Southern, brought in $8.1 million in revenue in 2023.  In the same year, CIF-Sac-Joaquin, the second-largest section, brought in $3.8 million in revenue.  Several other CIF Sections covered by ProPublica, including CIF-NC, CIF-SDS, CIF-CC, CIF-CS, each earned annual revenues for 2023 between $1 and $3 million.

137.    But the revenues earned by CIF, its Sections, and member schools are dwarfed by the revenues that CIF's media partners derive from the value of California high school student-athletes' labor and NIL.  On information and belief, CIF's media partners, and particularly the Media Defendants, keep the vast majority of the revenues they derive from student-athletes' labor and NIL as private corporate profits.  For instance, through its "School Broadcast Program," Defendant NFHS Network collects millions of dollars in subscription revenues directly from consumers of high school sports broadcasts, but remits only 10-20% of those revenues to the schools whose sporting events are being broadcast—and none to the student athletes. Defendant PlayOn, a privately held, for-profit corporation specializing in high school sports marketing, owner of Defendants Huddle Tickets, MaxPreps, VNN, and NFHS Network, has raised $96.4 million in private equity funding.

138.    To protect their profit margins, and with full knowledge of CIF's anticompetitive scheme, the Media Defendants willingly acquiesced in CIF's and its Sections' anticompetitive scheme to suppress competition for student-athletes' labor and NIL.  The Media Defendants had full knowledge of CIF's anticompetitive rules and restrictions limiting student-athletes' transfer eligibility and compensation for athletic labor and NIL, because those rules have been public since their adoption.  Any entity attempting to secure a lucrative contractual relationship with CIF or one its Sections can reasonably be presumed to have familiarity with those entities' public Constitution and Bylaws.

139.    The Media Defendants' acquiescence in CIF's anticompetitive scheme is also apparent from their lack of attempts to engage student-athletes in any sort of negotiation for their individual NIL.  As media companies familiar with NIL rights and usage, the Media Defendants would know that NIL rights typically attach to individuals, not institutions.  No reasonable media company would assume that it could simply negotiate an NIL waiver or licensing agreement with a school or university while entirely ignoring individual students.  Here, however, given their knowledge of the CIF's anticompetitive rules limiting NIL compensation to student-athletes, the Media Defendants never even attempted to approach CIF athletes concerning the use or licensing of their NIL.  The Media Defendants had no motive to do so, as the development of a competitive market for the NIL of high school student-athletes would reduce the rents they were able to collect and suppress their profit margins.  Instead, knowing the contours of the CIF's anticompetitive scheme in perfect detail (thanks to the CIF's public Bylaws), the Media Defendants chose to acquiesce in the CIF's anticompetitive scheme by colluding with CIF to suppress the growth of a competitive market for California high school student-athletes' labor and NIL.

140.    The vast majority of the revenues earned by CIF and the Section Defendants, as well as their media partners from these deals, are directly traceable to the value generated by CIF student-athletes' labor and NIL.  However, CIF's anticompetitive restrictions on compensation for athletic labor, school-affiliated NIL, transfers for athletic reasons, and recruiting work

together to largely bar California high school student-athletes from sharing in any of the profits generated by their participation in interscholastic athletics, creating substantial economic rents for CIF, its Sections, CIF member schools, and the Media Defendants.

### C. CIF's Anticompetitive Rules Harm Student-Athletes

141. The challenged restrictions, as adopted and enforced by CIF, its Sections, and CIF member schools, harm student athletes by limiting the competitive market for and denying them a fair share of the revenue currently being derived from their athletic labor and NIL. CIF's challenged restrictions effectively fix the price of student-athletes' athletic labor and NIL at zero. But for the challenged restrictions, California high school student-athletes would compete to sell their athletic labor in California's High School Athletic Labor Market, while CIF member schools and CIF Sections would compete to recruit and retain the best players through various strategies. Additionally, but for the challenged restrictions, CIF member schools and CIF Sections would compete to compensate student-athletes with a share of revenues received from the use of California high school student-athletes' NIL.

142. Because the vast majority of high school student-athletes do not proceed to play at the collegiate level, the CIF's unfair denial of California high school student-athletes' ability to earn fair compensation from their athletic labor and NIL comes at the point in most student-athletes' careers when their athletic labor and NIL are most valuable. The following sections explain how student-athletes would benefit from increased market competition if the CIF's anticompetitive restrictions were eliminated, the "but-for world."

### 1. The Challenged Restrictions Prevent the Growth of a Competitive Market for Student-Athletes' Labor

143. But for the challenged transfer eligibility restrictions and limits on compensation for athletic performance, California high school student-athletes would be able to compete to sell their athletic labor to particular California high school athletic programs in exchange for compensation packages comprised of direct payments, housing assistance, scholarships or tuition discounts, high-quality athletic facilities and personnel, NIL monetization opportunities, and

1    access to alumni and recruiting networks.  California high schools, CIF Sections, and their media

2    partners would compete to offer attractive compensation packages of these goods and services to

3    recruit and retain high school student-athletes.

4        144.    As discussed above (and as CIF, its Sections, and CIF member schools are well

5    aware), the California High School Athletic Labor Market already exists, as occasional violations

6    of CIF restrictions demonstrate.  However, the size and competitiveness of this market is

7    dramatically suppressed by the challenged CIF and Section restrictions on transfer eligibility and

8    compensation for athletic performance.  Because of the collective market power possessed by

9    CIF, its Sections, member schools, and the Media Defendants, their agreement to adopt and

10   enforce these limits precludes the growth of a competitive market and unlawfully fixes the price

11   that student-athletes can be compensated for their athletic labor at zero.

12       145.    That a market for high school athletic labor would grow significantly in the

13   absence of the challenged restrictions is made clear from recent, parallel changes in the market

14   for intercollegiate athletic labor.  The National Collegiate Athletic Association (NCAA)'s recent

15   suspension of parallel restrictions on transfer and NIL compensation at the collegiate level

16   provides a natural experiment that supplies evidence of how the relevant markets for California

17   high school interscholastic athletic labor and NIL would develop in the but-for world.  Beginning

18   on July 1, 2021, the NCAA decided to suspend many of its NIL compensation limits and transfer

19   rules governing collegiate student-athletes, motivated largely by the Supreme Court's decision in

20   *NCAA v. Alston*, 594 U.S. 69 (2021), decided on June 21, 2021, as well as other antitrust

21   litigation brought by college athletes challenging NIL restrictions.  The NCAA relaxed its

22   transfer restrictions at the collegiate level, eliminating the need for would-be transfers to seek

23   institutional permission, permitting immediate eligibility for first-time student-athlete transfers,

24   and removing a mandatory one-year sit-out period.  Additionally, in 2024, the NCAA eliminated

25   limits on how many times an athlete may transfer between universities.  If the athlete meets the

26   required G.P.A. and credit-hour benchmarks, they are eligible to transfer.

27

146.     These changes have enabled a marked increase in the number of collegiate student-athletes transferring between universities and a consequent improvement in the compensation packages offered to collegiate student-athletes.  In 2024, a full 27% of all NCAA student-athletes entering the transfer portal "unaided" (that is, not receiving athletic scholarships at their departing school), successfully transferred to another NCAA member school where they began receiving athletic aid—that means 1,753 athletes began receiving athletic aid as a result of increased competition for transfer students.  Also in 2024, 64% of all NCAA student-athletes entering the transfer portal already "aided" (that is, already receiving athletic scholarships at their departing school) successfully transferred to another NCAA member school where, presumably, they received a superior compensation package than the one offered by their departing school.  In 2024, the NCAA athletes in that category numbered 10,357.  In 2024, 80% of all transfers across all NCAA divisions received athletic aid (that is, a full or partial scholarship) at their destination school.

147.     The success of the NCAA's less restricted transfer portal in improving compensation packages offered to collegiate student-athletes has led to increased popularity of transferring among NCAA student-athletes, and the market for the athletic labor of collegiate student-athletes continues to expand.  In 2024, 62% of all Division I student athletes who entered the transfer portal were reported to have enrolled successfully at a new NCAA member school, a percentage that has steadily increased since 2022, the first year for which transfers were permitted.  For NCAA Division I student athletes, in 2021 (the first year in which transfer restrictions were lifted), there were 9,806 portal transfers.  By 2023, that number grew to 13,025, a 33% increase in two years.  For NCAA Division II student-athletes, in 2021, there were 2,180 portal transfers.  By 2023, that number grew to 3,453, a 63% increase in two years.  For the 2025-26 academic year, over 2,500 NCAA Division I men's basketball players entered the transfer portal, representing more than 40% of all total Division I men's basketball players.  The number of men's basketball players entering the transfer portal has also significantly increased for four consecutive years.

148.    A 2023 study of NCAA transfer migration patterns showed that a majority (66%) of successful transfers moved *down*, that is, to schools whose programs were less competitive, such as moving from a highly ranked conference to a lower-ranked conference, or from NCAA Division I to Division II.  That a majority of student-athletes are willing to transfer to less competitive schools demonstrates that these less athletically competitive schools have begun to offer compensation packages to potential transfers that more than make up for the loss of athletic competitiveness, such as with increased playing time, more valuable athletic scholarships, or additional opportunities for transfer students to monetize their NIL.

149.    Relatedly, lower-ranked NCAA member schools have also benefitted from the increased competition for collegiate athletic labor afforded by the less restricted transfer portal. One study of transfer migration patterns in Division-I men's football after the NCAA's 2021 suspension of transfer restrictions found that a larger number of players transferred *out* of so-called "Power-5 schools" (that is, schools in the five wealthiest, and winningest, conferences) than transferred *into* Power-5 schools.  The net result in Division-I men's football is "a smaller gap in talent between the 'levels' of college football," because the "transfer portal is giving non-Power-5 schools greater access to Power-5 talent than ever before."  In addition, for NCAA Division-I men's football teams, a higher percentage of transfers on the roster was found to be correlated to a larger "win differential" (that is, increased number of wins from the prior season), so lower-tier football programs seeking to improve their records were able to turn to the transfer portal in higher numbers as a significant new source of athletic talent.

150.    As demonstrated by these changes at the collegiate level, if parallel CIF rules and regulations limiting transfer eligibility and compensation for students' athletic labor were eliminated, the California High School Athletic Labor Market would likely expand dramatically. As described above, the California High School Athletic Labor Market already exists in nascent form.  CIF student-athletes involved in illicit transfers for athletic reasons are already enticed to join some high school athletic programs with certain compensation packages (albeit more limited due to CIF's restrictions), which may include scholarships for private high schools.  According

to one 2015 report on high school athletic recruiting in California, "many private schools have the ability to pay for an athlete's tuition, giving students a free alternative to public schooling. This advantage takes money out of the equation, leaving the athlete to compare a private school's facilities, academics and athletic program against a public school" in their attendance and transfer decisions.

151.    For instance, the aforementioned 2015 report discusses one California high school student-athlete, Eli Givens, as an example of a student-athlete who was sought after by multiple high schools for his athletic abilities in both hockey and in football.  In the summer after eighth grade, Givens was approached by a hockey coach from Bellarmine College Preparatory.  His sophomore year, a football coach from Saint Francis High School contacted him as well.  Givens stated that, per the offers he had received from those schools, "if you try out and make it, they can give you a scholarship."  On information and belief, Givens' experience is not unique; it is likely that many student-athletes in California receive similar illicit recruiting or transfer offers for compensation packages of unknown size and quality.  But for CIF's anticompetitive restrictions on transfers and compensation for athletic labor, the number of students able to compete by selling their labor in this market would expand dramatically.

152.    In addition to the direct, monetary benefit students would receive for their athletic labor in the but-for world, CIF member schools would also be incentivized to compete by investing in improved facilities and personnel to train and develop their student-athletes, increasing their student-athletes' NIL monetization opportunities, and building strong alumni and collegiate and professional athletic recruiting networks.  For instance, one former athletic director and industry expert, writing for the NFHS blog, advised high schools that high-quality facilities, funding, and personnel were key aspects of competition in the "arms race in athletics with respect to building new, spectacular facilities and providing amenities to attract athletes."  He stated, "Certainly, you always want the best facilities possible for your athletes, but facilities and money do not make a program!  Instead, it is always the people who make the difference.  If your school has subpar facilities and limited financial resources, it does make things a little more

difficult.  But talented, dedicated, hard-working people can and do overcome hurdles.  The secret, therefore, is to fill your coaching positions with individuals who have these positive qualities and who will do everything possible to help their athletes to be the best that they can be."

153.   Just like private schools, public schools also have incentive to compete to attract student-athletes.  According to one education industry publication, "Public school enrollment is declining, with up to a 6% decrease by 2030 according to federal estimates, and open-enrollment policies are becoming more common.  And since most districts' funding is calculated, in part, based on student enrollment, [public] schools are now having to think critically about how to attract and maintain attendance for the first time.  Athletic facilities are a great avenue to solve this challenge.  Athletic facilities are highly visible representations of the school district to the public at large and are often the lens through which the community gauges a district's leadership."

154.   In states where public schools are permitted to maintain open-enrollment policies, such as Wisconsin, high schools already compete to build top-notch athletic facilities to recruit and retain student-athletes.  According to one local Wisconsin paper, "Wisconsin's open-enrollment policy has made it easier for families to hand pick where their children get their education, and everyone understands athletics play a role in the selection process."  Kevin Flegner, a Wisconsin athletic director whose school routinely produces some of the state's best programs and possesses arguably the state's best football facility, commented "Not only are [students and families] shopping programs, they're shopping facilities . . . . . I've always said everyone around us is a sleeping giant, and we have to make sure we stay ahead of that curve.  We like to consider ourselves a leader, but at the same time, it's all based on resources."

155.   Accordingly, CIF's anticompetitive restrictions harm California high school student athletes by precluding the growth of a competitive market for their labor, by suppressing the quality of the compensation packages offered to them by CIF member schools, and by fixing the price of their athletic labor at zero.  More competition for their athletic labor means

California high school student-athletes would receive improved compensation packages in the form of direct payments, housing assistance, scholarships or tuition discounts, higher-quality athletic facilities and personnel, NIL monetization opportunities, and access to alumni and recruiting networks. Accordingly, CIF's anticompetitive restrictions harm California high school student-athletes by depriving them of improved quality in the compensation packages offered by CIF member schools.

### 2. The Challenged Restrictions Hamper the Growth of a Competitive Market for Student-Athletes' NIL

156. California high school student-athletes' NIL is already extremely valuable, both on the part of individual, high-profile student-athletes, as well as collectively for CIF member schools, CIF, its Sections, and their media partners. The value of high school student-athletes' NIL only increases as the high school sports industry continues to grow. While California high school student-athletes are already permitted to profit from their personal NIL, CIF restricts its student-athletes' ability to receive compensation for their school-affiliated NIL and for their athletic labor beyond certain limited amounts. These restrictions grant CIF, its Sections, member schools, and media partners monopolistic control over the licensing and use of student-athletes' school-affiliated NIL, enabling them to retain the entirety of the rents that accrue from such licensing and use. In the absence of the challenged restrictions, CIF Sections, member schools, and media partners would have to compete for the opportunity to license and use this NIL, presumably by offering student-athletes a competitive share of their revenues or other favorable terms. Accordingly, by maintaining these restrictions on student-athlete compensation, CIF, its Sections, member schools, and the Media Defendants have successfully colluded to avoid competing with one another to offer student-athletes a share of the revenues that accrue because of the licensing and use of student-athletes' NIL. Student-athletes have been harmed by the denial of a competitive share of these rents and by the suppression of a competitive market for their NIL.

157.    California, like most states, already allows individual high school student-athletes to profit from their NIL, as long as they do not do so in affiliation with their team or school. Because high school athletes may profit from their NIL, "[t]here are high school athletes that are making droves and droves of money right now," according to Braly Keller, director of NIL and business insights at Opendorse, an NIL tech platform that currently has 150,000 athletes under contract.

158.    According to an article by Dan Johnson in the Journal of Financial Planning, "[f]or example, Arch Manning, a high school senior and nephew of legendary NFL quarterbacks Peyton and Eli Manning, is worth over $3.4 million in NIL compensation. Similarly, Bronny and Bryce James, sons of NBA legend LeBron James, each attend Sierra Canyon High School in Chatsworth, California, and are worth approximately $7.3 million and $977,000, respectively. In fact, even in middle school, some athletes in hotbed areas like Texas and Florida are receiving attention from booster affiliates and signing private NIL deals worth hundreds of thousands."

159.    Nike's first-ever NIL compensation deal with high school athletes began when it signed California high school women's soccer players Alyssa and Gisele Thompson in May 2022. At the time, the sisters were respectively a 17-year-old junior and a 16-year-old sophomore attending the Harvard-Westlake School, a college preparatory school in Los Angeles, and their NIL partnership with Nike was a multi-year deal involving an undisclosed amount of monetary compensation.

160.    Nike went on to make additional NIL deals with California high school basketball players, including Bronny James, son of NBA Hall of Fame player LeBron James. Nike signed James in 2022, when he was still a high school senior at Sierra Canyon High School in California. James went on to play for the University of Southern California, where his NIL value was estimated at $5.9 million for the 2023-24 season, making it the most valuable NIL of any NCAA athlete at the time. James now plays professionally for the Los Angeles Lakers.

161.    In women's basketball, Nike cut an NIL deal with Sierra Canyon High School player JuJu Watkins, who signed a multi-year partnership while still a senior at Sierra Canyon

High School.  Watkins went on to star at the University of Southern California, and has since

signed over 20 NIL deals worth an estimated three-quarters of a million dollars.

162.     Jared McCain, another men's basketball player, signed an NIL deal worth over $1

million as a rising senior at Corona Centennial High School near Los Angeles.  After playing one

year for Duke University, he now plays professionally for the Philadelphia 76ers.

163.     Mikey Williams, a men's basketball player who spent his freshman year playing

at San Ysidro High School in San Diego, California, had a reported NIL value of $2.6 million

while still in high school.

164.     In 2024, a high school men's basketball player, AJ Dybantsa, signed an NIL deal

with Nike reportedly worth $4 million.  As a sophomore, Dybantsa transferred from a

Massachusetts high school to Prolific Prep in Napa Valley, California, which holds itself out as a

"first-of-its-kind basketball academy" offering "a college-preparatory education on and off the

basketball court," offering "once in a lifetime opportunities for student-athletes from around the

world" in conjunction "with it's [sic] educational partner, Napa Christian [Academy]."  Students

attending Prolific Prep are offered "host family living situations."

165.     In February 2025, Marist (Georgia) High School junior Kate Harpring—a five-

star basketball prospect with scholarship offers from all the top colleges, and the daughter of

NBA veteran Matt Harpring—signed an NIL deal with Leaf Trading Card to produce her own

brand of licensed trading cards.

166.     Beyond a few extremely high-earners, average NIL deals for most high school

student-athletes (in states where they are permitted to monetize their NIL) are on the order of

hundreds to a few thousand dollars annually.  For instance, in North Carolina, the average NIL

deal for high school athletes is valued to be between $60 to $120 with commitments of three to

four hours.  But these amounts make a difference for many student-athletes.  For instance, Richie

Clementi, a high school men's wrestler from Louisiana, earns only four-figure amounts for his

NIL.  But in an interview, he stated that "[t]he money that's paid to him from companies offers

him an opportunity to become a better wrestler—instead of working a minimum wage job which

would take him away from important practices.  He credits that advantage to his winning record on the wrestling mat."

167.    In addition to the value of individual high school student-athletes' NIL, the NIL of high school student-athletes has significant collective value to CIF, its Sections, and its member schools, as well as their media partners.  The value of students' collective NIL can be seen in the large amounts of money that CIF, its Sections, and its member schools receive for the sale of broadcast and streaming rights as well as for their partnerships with sports data and marketing companies, as described above.

168.    Again, the recent relaxation of NIL compensation limits at the collegiate level provides key insights into the but-for world if CIF's anticompetitive restrictions were removed.  At the collegiate level, an economic study found that "the restrictions that largely barred student-athletes from sharing in any of the profits generated by their participation created substantial economic rents for universities.  These rents are primarily generated by men's football and men's basketball programs."  But now that programs are required to compete to recruit and retain new student-athletes and transfers, "[v]ast sums of money that once went to athletic departments are now being diverted to players" in the form of NIL deals and revenue sharing.  Players are receiving money for both their individual NIL, through third-party NIL sponsorships, as well as through revenue sharing for the collective use of their NIL in broadcasts and other licensing arrangements.

169.    College athletes earned more than $338 million on NIL deals in 2024, according to Opendorse.  That number is expected to quadruple past $2 billion in 2025.  Those amounts do not include the new revenue-sharing model for the collective use of student-athletes' NIL for broadcast licensing built into the proposed settlement in *In re: Collegiate Athlete NIL Litigation*, No. 4:20-cv-03919-CW (N.D. Cal.), that, if approved by the court, will allow each member university to disburse as much as $20.5 million per year in direct compensation to college athletes.

170.    Universities are also beginning to feel competitive pressure to offer NIL deals to attract student-athletes to their programs.  Nick Saban, football coach at the University of Alabama, stated that his team was considering changing its practice of declining to offer its student-athletes NIL deals because "more and more people are doing it."  But this competition has benefits for both student-athletes and universities: "What the public has to be aware of is that these NIL laws were created in the spirit of being beneficial to the players—and they are," said Tim Derdenger, a sports marketing and branding expert at Carnegie Mellon University.  "But teams are also utilizing them to make themselves better off, and they're doing it by creating these booster entities that funnel NIL deals to these players."  The elimination of NIL restrictions at the NCAA level has allowed the growth of a booming market for intercollegiate athletic NIL, which has grown from $917 million in 2021-22, the first year NIL was permitted, to $1.67 billion in 2024-25.  The market is projected to top $2.5 billion in 2025-26.

171.    These trends at the collegiate level make clear that, "[i]f NIL activity continues to increase in high school, students will be further incentivized to choose schools with outstanding sports programs" and the resources and policies to help students monetize their NIL.

172.    As demonstrated by these changes at the collegiate level, if parallel CIF rules limiting compensation for students' school-affiliated NIL were eliminated, the California High School Student-Athlete NIL Market would expand dramatically.  As described above, the California High School Student-Athlete NIL Market already exists insofar as CIF permits its student-athletes to profit from their individual NIL independent of any school affiliation. However, CIF's anticompetitive restrictions on revenue sharing, transfer eligibility, and compensation for student-athletes' individual and collective NIL suppress the formation of a competitive market for student-athletes' NIL and suppress the wages student-athletes receive for the collective licensing of their NIL for broadcasts, streaming, and other sports data and marketing purposes at zero.  CIF student-athletes are harmed by this suppression of competition and the resulting lower revenues received for their NIL.  The elimination of the challenged restrictions would mean that CIF member schools and CIF Sections must begin to compete to

offer a share of their revenues for use of student-athletes' NIL back to student-athletes, either as direct revenue-sharing or in the form of improved compensation packages for student-athletes' choice to sell their athletic labor to that CIF member school and CIF Section.  In addition to the direct, monetary benefit students would receive for their NIL in the but-for world, CIF member schools would also be incentivized to compete by investing in increasing their student-athletes' NIL monetization opportunities, such as through the development of high school-level NIL collectives or robust booster clubs.

173.    Accordingly, CIF's anticompetitive restrictions harm California high school student athletes by precluding the growth of a competitive market for their NIL, by suppressing the quality of the compensation packages offered to them by CIF member schools, CIF Sections, and media partners, and by fixing the price student-athletes receive for the use and licensing of their school-affiliated NIL at zero.  More competition for their NIL means California high school student-athletes would receive additional compensation in the form of direct revenue sharing, improved compensation packages, or additional NIL monetization opportunities.

174.    The vast majority of high school student-athletes do not continue to compete in their sports at the collegiate, let alone the professional, level.  The National Federation of State High School Associations (NFHS) stated that only "a very small percentage of the almost eight million participants in high school sports will play at the college or professional levels."  "About one percent of the 537,000 boys and 1.4 percent of the 373,000 girls who participate in high school basketball will play the sport at the NCAA Division I level.  And of the one million-plus boys who play high school football, only three percent will play at the major college level.  And the chances of playing in the National Basketball Association (.03 percent) or the National Football League (.08 percent) are infinitesimal."  Accordingly, the CIF's anticompetitive restrictions on high school student-athletes mean that most will lose out on their best and perhaps only early-career opportunity to monetize their NIL and athletic labor and develop the skills of running their own small business early in their careers.

**D.    CIF's Anticompetitive Rules Are Not Necessary to Serve Any Legitimate Pro-Competitive Purpose**

175.    As explained above, Defendants' restraints have anticompetitive effects in the relevant California High School Student-Athletes Labor and NIL markets.  Any purported procompetitive justifications, on the other hand, concern entirely separate and distinct output markets for high school sports and are therefore legally irrelevant for antitrust analysis in this case.

176.    Echoing arguments raised by defendants in litigation concerning the anticompetitive effects of the NCAA's parallel restrictions on compensation and transfers at the collegiate level, CIF and Defendants here may attempt to raise several arguments to support the challenged restraints: (1) preservation of consumer demand for high school sports, (2) preserving the educational mission of high school athletics, and (3) preservation of team cohesion and equity on and among high school athletic teams.  However, none of those qualify as legitimate procompetitive defenses for the challenged restraints.

**1.    Consumer Demand for High School Sports Is Legally Irrelevant Because It Concerns an Entirely Different Market.**

177.    Defendants' restraints are not necessary to preserve consumer demand for high school athletics.  Even if the challenged restraints had some effect on generating or preserving consumer demand, that demand relates to the consumer market for California high school athletics, which is a different market than the restrained markets—the markets for the sale and purchase of California high school student-athletes' labor and NIL.  Any effects on the preservation of general consumer demand for high school sports are therefore legally irrelevant.

178.    Even if the impact on consumer demand for California high school sports was legally relevant, the restraints at issue here are not necessary to preserve such demand.  Public opinion strongly suggests that fans support the ability of high school student-athletes to profit from the use of their NILs and for their work, undermining any suggestion that consumer demand requires athletic leagues like CIF to engage in wage-fixing or other artificial caps on

players' ability to benefit from their NIL and athletic labor. A 2023 national poll conducted by the Shirley Povich Center for Sports Journalism, The Washington Post, and the Center for Democracy and Civic Engagement at the University of Maryland revealed that 54% of Americans believe that high school athletes should be allowed to earn money through endorsement deals. Support was higher among respondents who are Black (74%) and Hispanic (73%).

179.    The extremely lucrative, multi-year NIL deals commanded by California high school student-athletes like Alyssa and Gisele Thompson, Bronny James, JuJu Watkins, and Jared McCain demonstrate the intense market demand that exists for products endorsed by or affiliated with California high school student-athletes. Presumably, if compensating high school student-athletes alienated fans or otherwise reduced consumer demand for high school sports, then these highly compensated NIL deals would be self-defeating. One economic analysis of demand for amateurism at the collegiate level explained, "If consumer demand is truly a function of amateurism, then a rigorous standard setting and inspection regime, without the need for collective boycott, would suffice. If there were truly a demand for amateurism, then that consumer demand would be sufficient to prevent teams from making the 'quantum leap' [to paying athletes market rates] that destroys demand, and the promise of a rigorous certification and inspection (but not enforcement) would be all that is needed to ensure against market collapse." But instead, the fact that large, national brands including Nike continue to repeatedly invest in NIL deals with California high school student-athletes shows that demand is not contingent on those players' amateur, uncompensated status.

180.    This is also evidenced by parallel changes in student-athlete compensation restrictions at the collegiate level. Over the past decade, a number of NCAA rules that were previously defended on grounds of preserving consumer demand for amateurism have been abandoned. For example, as described above, the NCAA has now begun to allow substantial and unlimited NIL payments from third parties, has expanded full-cost-of-attendance scholarships, and has begun to offer limited, direct compensation to student-athletes, all without any adverse

impact on consumer demand for college athletics.  To the contrary, there is reason to believe that television ratings and revenues have increased significantly following those changes.  The preservation of demand for uncompensated high school sports therefore is not a legitimate justification for these restraints.

181.    If anything, the removal of the NCAA's anticompetitive restrictions against athlete compensation and transfer has expanded the pool of colleges able to field competitive athletic programs, as shown in the studies of NCAA transfer dynamics described above. Analyzing the changes at the NCAA level, Richard Paulsen, a sports economist and professor at the University of Michigan, has stated that the impact of NIL compensation and the transfer portal on various teams' athletic competitiveness is indeterminate.  According to Paulsen, "The top schools have an advantage in getting the A-level talent, but some of the players that might have sat on the bench at a top school previously could be enticed away with NIL money coming from a second tier school . . . .  So I think the impact on competitive balance is maybe a little bit less clear."  An increase in the number of athletically competitive programs is likely to result in the overall growth of consumer demand for collegiate athletics, as is already being borne out at the NCAA level: "The college athletics economy has experienced massive growth as a result of increasing demand for athletes thanks to NIL."

182.    The natural experiment brought about by the NCAA's suspension of its NIL restrictions above demonstrates that CIF's parallel anticompetitive rules challenged herein are not needed to preserve consumer demand for high school athletics.  But even if these rules do serve those ends in some way, there are reasonable and less restrictive alternatives available which would preserve consumer demand for high school sports without entirely suppressing the emergence of competitive markets for California high school student-athlete labor and NIL.  For instance, experts in sports economics and policy expect that regulators at the state and federal levels will likely step in to impose reasonable limits on NIL compensation and pay-for-play at the collegiate level, including certain "transfer restrictions, collectively bargained salary caps, conference realignment to avoid concentration, turning athletic departments into LLCs, putting

degree completion into bylaws and evening out the number of roster spots, among other rules."
There is no reason similarly reasonable, less restrictive alternatives would not work at the high
school level.

### 2. Education and Compensation Are Not Mutually Exclusive.

183. Nor are Defendants' restrictions needed to promote the integration of high school
athletes into their educational communities. If compensation for labor was incompatible with the
ability of high schools to keep education at the center of a high school student-athlete's
experience, then no high school student should be allowed to perform *any* type of compensated
labor whatsoever. But that is neither the law nor the economic reality in California. According
to the Bureau of Labor Statistics, about a quarter of high school students work jobs while also
attending school. For children aged 14 and 15, California permits compensated work up to 18
hours a week while school is in session (up to three hours per day on school days, and eight
hours per day on non-school days), and up to 40 hours a week while school is out of session. For
children aged 16 and 17, California permits compensated work up to 48 hours per week year-
round, regardless of whether school is in session (up to 4 hours on any school day, and eight
hours on non-school days). In fact, California permits the sale of labor and NIL of children as
young as *15 days* (i.e., month-old infants) in the entertainment industry, with the proper work
permits. Minors are required to be compensated for their labor at or above the minimum wage
rates required by state and federal law.

184. It would be bold exceptionalism on the part of California high school athletic
departments to argue that the labor performed by student-athletes is undeserving of
compensation, or that compensating student athletes for this labor would somehow be more
harmful to their educational experiences than permitting them to work other minimum-wage
jobs. For some high school athletes, particularly those from low-income families, NIL
compensation is the only reason they are able to avoid taking such a minimum wage job. For
example, according to Richie Clementi, a high school men's wrestler from Louisiana who earns
several thousand dollars a year from NIL compensation, "[t]he money that's paid to him from

1    companies offers him an opportunity to become a better wrestler—instead of working a

2    minimum wage job which would take him away from important practices. He credits that

3    advantage to his winning record on the wrestling mat." A college athlete, commenting on her

4    experience of gaining the right to profit from her NIL, stated that the changes "allow[ed

5    collegiate student-athletes] to make a living while immersed in the full time job that is being a

6    collegiate athlete."

7        185.    Certainly, CIF's mission to ensure that "the first priority of their student-athletes

8    is a serious commitment to getting an education and developing the academic skills and character

9    to succeed" is laudable. CIF Constitution Article 1, Section 12(H). However, that goal does not

10   require the perpetuation of the CIF's challenged restrictions. Instead, it is better served by other,

11   less restrictive alternative rules and regulations that don't limit compensation to student-athletes

12   for their athletic labor and NIL. Less restrictive alternative rules could instead condition student-

13   athletes' eligibility to participate in CIF events on class attendance or maintenance of good

14   academic standing, or could cap the number of hours per week student-athletes are permitted to

15   spend on sports versus academic activities. In fact, CIF rules already do this. CIF Bylaw 205

16   creates strict "Scholastic Eligibility" requirements that students must meet in order to participate

17   in CIF events, including a minimum GPA requirement of 2.0 on a 4.0 scale, and enrollment in a

18   minimum number of credit hours each semester. Meanwhile, "[f]or the benefit of the physical

19   and mental health of our student-athletes," CIF Bylaw 506 caps the number of hours students

20   may spend in practices for a particular sport at 18 hours weekly, and four hours daily. In fact,

21   CIF's use of the same daily and weekly hours limits as imposed by the State of California on

22   teenage workers could be seen as CIF's implicit acknowledgement that students' athletic labor *is*

23   labor. CIF Member schools may be penalized for exceeding these hourly limits on practice time.

24   CIF Bylaw 506(F).

25       186.    Nor can CIF argue that an increase in the number and availability of transfers

26   would meaningfully undercut the educational experience of student-athletes. First, California

27   has no statewide restrictions on the number of times that students may transfer between high

1    schools, meaning that California public policy does not treat the harm of changing schools as

2    outweighing the benefit to students and their families of having freedom to adapt to changes in

3    life circumstances.  Indeed, the life circumstances of some students, such as those with parents in

4    the military, require them to transfer between high schools repeatedly.  CIF itself already codifies

5    formal exceptions to its transfer eligibility policy for students who qualify under a list of

6    "hardship" circumstances in CIF Bylaw 207(B)(5)(c)(viii), including court-ordered transfers,

7    children of divorced parents, student safety incidents, discontinued programs, foster children or

8    homeless children, military service, married status, or a Board of Education ruling.  On

9    information and belief, thousands of students qualify for these transfer exceptions each year.  To

10   the extent that CIF attempts to justify its transfer restrictions on the grounds that repeated

11   transfers are harmful to student-athletes' educational experience, its long list of exceptions and

12   California public policy belie that proposition.  In any event, the goal of keeping student-

13   athletes' academic experience as their priority is already better served by CIF's more narrowly

14   tailored rules concerning scholastic eligibility.

15        187.    Therefore, additional rules that are geared at limiting high school athletes' ability

16   to transfer or receive compensation for their NIL or labor are redundant and unnecessary to allow

17   schools to retain their educational mission as the first priority for student-athletes.  Rather than

18   vindicate an interest in promoting educational goals, they instead primarily serve the purpose of

19   restraining the markets for student-athlete labor and NIL.

20        188.    Relatedly, CIF might argue that preventing high school student-athletes from

21   seeking and receiving compensation for their athletic labor and NIL prevents them from being

22   exploited by high school athletic programs or third-party sponsors and advertisers seeking to

23   capitalize on their athletic prowess.  But this is exactly backwards.  CIF's challenged restrictions

24   don't prevent exploitation; they are themselves exploitative.

25        189.    The most obvious rejoinder to this argument is that, as described above, CIF, its

26   Sections, and CIF member schools (not to mention their media partners) already profit

27   immensely from student-athletes' labor and NIL.  The issue is whether student-athletes are

1    entitled to a fair share of those revenues.  As explained above, in the competitive market that

2    would exist but for CIF's challenged restrictions, CIF Sections and member schools would

3    compete to offer students high-quality compensation packages in exchange for their athletic

4    labor, and would also compete to offer student-athletes a share of the revenues derived from the

5    use of their NIL.

6        190.    It is true that social media is the primary driver of most third-party NIL revenue

7    for athletes at all levels, with nearly three-quarters of all NIL deals derived from social media

8    content creation.  But any argument by CIF defending its limits on NIL compensation as

9    protecting students from exploitation on social media is self-defeating, for three reasons.  First,

10   CIF already permits its student-athletes to earn an unlimited amount of revenue from third-party

11   NIL, so long as student-athletes do not do so in affiliation with their school or team.  Second,

12   CIF itself frequently profits from the use of its student-athletes' NIL for promotional purposes on

13   social media, often without their knowledge or consent.  Since at least 2019, Defendant NFHS

14   Network has offered subscribing schools and interscholastic associations "artificial intelligence-

15   based highlight detection and one-click distribution of content to their websites and across social

16   media channels," a development that it called "an incredible day . . . for high school athletes

17   across America."  And NFHS Network (the exclusive streaming partner of CIF) calls itself "the

18   undisputed leader in high school sports content creation."  Finally, the State of California places

19   no restrictions on teenagers' use of social media to earn revenue, either by limiting the amount of

20   time that teenagers can spend in social media content creation per week or by limiting the

21   amount of compensation teenagers can earn from social media content creation.  Conversely,

22   recent California state legislation, Senate Bill 764 (known as the Child Content Creator Rights

23   Act) mandated equitable preservation and distribution of the income earned by child influencers

24   to those children.  Accordingly, any argument from CIF that its prohibitions on NIL revenue

25   sharing and other compensation to student-athletes are essential to protect them from exploitation

26   on social media is specious.

27

191.    Public opinion confirms that it is CIF's limits on high school student-athletes' ability to earn compensation from the use of their NIL which are perceived as exploitative, rather than the other way around.  According to the leading survey, conducted by the Shirley Povich Center for Sports Journalism at the University of Maryland, in collaboration with the university's Center for Democracy and Civic Engagement and the Washington Post, 54% of the over 1,500 respondents believe that high school athletes should be allowed to earn money through endorsement deals.  Support was particularly high among Black and Hispanic American respondents, at 73% and 74%, respectively.

192.    The American public is also comfortable with corporate sponsorship of athletic activities at the high school level.  In a survey of over 1,000 adults nationwide on behalf of the Commission on the State of the U.S. Olympics and Paralympics (CSUSOP), "corporate sponsorships" proved to be the most popular idea among respondents for how government could provide additional funding for youth sports.

193.    Nor do high school student-athletes themselves feel exploited or alienated by gaining the ability to profit from their athletic labor and NIL.  In the leading survey of over 5,000 college student-athletes and 1,000 high school prospects conducted by Bill Carter, an expert in NIL rights, over 90% of respondents said that granting student-athletes the ability to monetize their NIL had no impact on locker-room social dynamics.  Accordingly, CIF cannot argue that the challenged restrictions are necessary to prevent exploitation of student-athletes; instead, it is their own rules and regulations which lead to exploitation.

### 3.    The Challenged Restrictions Disproportionately Harm Low-Income and Student-Athletes of Color

194.    As evidenced by the strong support for high school athletes' ability to receive NIL compensation among Black and Hispanic American survey respondents, CIF's challenged restrictions disproportionately harm student athletes of color and individuals from low socioeconomic status communities.

195.    One study of the NCAA's previous parallel anticompetitive restrictions found that "the existing limits on player compensation effectively transfers [sic] resources away from students who are more likely to be black and more likely to come from poor neighborhoods towards students who are more likely to be white and come from higher-income neighborhoods." This is because, at the time, "intercollegiate amateur athletics in the US bar[red] student-athletes from sharing in any of the profits generated by their participation, which create[d] substantial economic rents for universities.  The economic rents from amateur athletics are primarily generated by men's football and men's basketball programs," whose rosters are disproportionately filled with Black players and other players of color.  At the university level, "rent-sharing leads to increased spending on women's sports and other men's sports as well as increased spending on facilities, coaches' salaries, and other athletic department personnel," which redistributes resources away from sports in which Black players and other players of color have more representation.

196.    The same study found that "[a] similar dynamic applies to rent-sharing for coaches and administrators as well—where the majority of beneficiaries of the rents generated by the activities of revenue sport athletes are white."  Because a larger percentage of athletic directors and coaches versus student-athletes participating in the highest revenue sports are white, "rent-sharing in the form of non-athlete compensation also involves a transfer from athletes that are poorer and more likely to be black to coaches and administrators that are more likely to be white."

197.    This and other studies about the effects of NIL compensation on equity and inclusion in collegiate athletics demonstrate the beneficial effects that eliminating CIF's anticompetitive restrictions would likely have for high school student-athletes from communities of color or low-income backgrounds.  For instance, one commentator stated that "by creating a more financially stable environment for Black college athletes, NIL deals can help address longstanding issues of racial inequity in college sports."  "NIL opportunities can be used by Black athletes to expand identities, create and nurture relationships with mentors from Black-

owned businesses, and develop programs in Black communities and organizations that promote social justice and racial equity."

198.    Additionally, participation in high school athletics can be financially burdensome on low-income students and parents. A 2022 study found that the average youth sports parent spent $883 on one child's primary sport per season. And a recent Aspen Institute study found that the average U.S. sports family spent $1,016 on their child's primary sport in 2024. That represents a 46% increase since 2019, twice the rate of price inflation in the U.S. economy during the same period. For high school-aged youth athletes in particular, the average annual spending per child tops $1,900. The study attributed the sharp increase to the "rising commercialization of youth sports."

199.    The amount families currently spend on youth sports varies significantly by household income, as shown in the Aspen Institute graphic below.



### Annual Family Youth Sports Spending – Income
Average amount spent in past year for all of child's sports

Household Income

| | |
|---|---|
| $0-$49,999 | $890 |
| $50,000-$99,999 | $1,387 |
| $100,000 or more | $2,361 |

Source: 2025 Youth Sports Parent Survey, Aspen Institute Project Play initiative, Utah State University Families in Sport Lab, Louisiana Tech University Minds in Motion Lab.



200.    Another survey by the Aspen Institute's Project Play found that "[h]alf of survey respondents who played youth sports or who have children who have played said they have

struggled to afford the costs to participate.  The issue impacts a broad swath of Americans of all backgrounds, including 66% who are Latino/a, 62% of 35-49-year-olds, 58% of those with high school educations, 57% of lower-income adults, and 56% of both Republicans and those who rent their homes.  More than 4 in 5 Americans say sports should be more accessible to those in underserved communities, as well as for athletes with physical disabilities."

201.    Permitting high school student-athletes to earn compensation for their athletic labor and NIL would help students and their families offset some of the high and growing cost of participating in high school sports, allowing more equitable and inclusive participation for students of color and low-income students.

202.    Accordingly, there are no procompetitive justifications for CIF, its Sections, and the Media Defendants' challenged restraints.  Even if there are, they could be accomplished through less restrictive means.

## VII.    CLASS ALLEGATIONS

203.    **Class Definition**: Plaintiff brings this proposed class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and a Class of others similarly situated, defined as follows:

> All student athletes who compete on, or competed on, a CIF member school athletic team at any time between May 30, 2021 and the date of any judgment.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

204.    **Numerosity**: The exact number of Class members is unknown and not available to Plaintiff at this time, but upon information and belief it is at least several hundred thousand

people.  Individual joinder is impracticable.  Class members can be identified through Defendants' records.

205.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the proposed Class, and those questions predominate over any questions that may affect individual members of the Class.  Common questions for the Class include, but are not necessarily limited to, the following:

    a)    Whether Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Class;

    b)    Whether such conduct caused members of the Class to receive less compensation than members of the Class would have otherwise received;

    c)    Whether Defendants' conduct was unfair or unlawful;

    d)    Whether Defendants violated state and/or federal law;

    e)    Whether the conduct of Defendants injured the business or property of Plaintiff and class members;

    f)    Whether the Class is entitled to injunctive relief, and if so, the nature and extent of such relief;

    g)    The amount of damages sustained by Plaintiff and members of the Class; and,

    h)    Whether Defendants have been unjustly enriched.

206.    **Typicality:** Plaintiff's claims are typical of the claims of the Class members in that Plaintiff, like all Class members, has been injured by Defendants' conduct.

207.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions.  Plaintiff's claims are representative of the claims of the other members of the Class.  Plaintiff and the Class members sustained damages as a result of Defendants' conduct.  Plaintiff also has no interests antagonistic to those of the Class, and

Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to the Class.

208. **Refusal to Act:** Defendants have acted or refused to act on grounds generally applicable to members of the proposed Class, thereby making final injunctive relief appropriate for the Class as a whole.

209. **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

210. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## VIII. <u>CAUSES OF ACTION</u>

### <u>COUNT I: UNREASONABLE RESTRAINT</u>

### <u>Violation of Section 1 of the Sherman Act — 15 U.S.C. § 1</u>

211. Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

212. Defendants, by and through their officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Classes for the use of, and to limit supply for the licensing and sale of, their images, likenesses, and/or names and for their athletic services in the

State of California and throughout the United States in violation of Section 1 of the Sherman Act.

213.    Defendants' unlawful conduct deprived Plaintiff and the Class of compensation for the use of their names, images, and likenesses and their athletic services. This unreasonable restraint on competition has artificially limited supply and depressed compensation paid to Plaintiff and the Class.

214.    Plaintiff and the Class received less than they otherwise would have received for the use of their images, likenesses, and/or names and their athletic services in a competitive marketplace. They were thus damaged and seek to recover for those damages.

215.    Defendants' abridgement of compensation rights for current and former high school athletes is not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and for their for-profit business partners by being able to take the revenue related to the commercial use of students' names, images, and likenesses, as well as students' athletic labor, for themselves. Defendants' actions have no relationship to any alleged goal of amateurism, promoting educational objectives, or other procompetitive purposes. CIF's rules instead regulate commercial markets and therefore are illegal.

216.    As a direct and proximate result of Defendants' scheme, Plaintiff and the Class have been injured and financially damaged. Their injuries consist of receiving lower compensation for use of their NILs and for their athletic services than they would have received but for Defendants' conduct. Plaintiff and the Class's injuries are of the type the antitrust laws were designed to prevent and flow from the very conduct that violates the antitrust laws.

217.    Defendants have collectively conspired to illegally limit and depress the compensation for high school athletes for the use of their NILs and athletic services.

218.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants. Moreover, to the extent any legitimate justifications may exist in theory, reasonable and less restrictive alternatives are available that would cause less competitive harm to Plaintiff and the Class.

219.    As a result, Plaintiff and the Class are entitled to treble damages, attorney's fees, and costs as set forth by law.  Additionally, Plaintiff and the Class are entitled to injunctive relief to end the anticompetitive practices alleged herein and to require Defendants to take steps to correct the market.

### COUNT II: GROUP BOYCOTT/REFUSAL TO DEAL

### Violation of Section 1 of the Sherman Act — 15 U.S.C. § 1

220.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

221.    Defendants, by and through their officers, directors, employees, agents, or other representatives, have entered into a continuing horizontal and vertical contract, combination, and conspiracy in restraint of trade in the relevant markets to effectuate a horizontal group boycott of Class members.  Defendants' group boycott and refusal to deal encompasses their concerted acts to prevent the Class from being compensated for the use of their NILs or athletic services in the State of California and the United States in violation of Section 1 of the Sherman Act.

222.    Defendants' group boycott and refusal to deal include Defendants' concerted action to require all current high school athletes to abide by their regulations.  In effect, this is a refusal to deal with members of the Class on compensation rights issues, foreclosing them from access to the marketplaces alleged herein.  Defendants use eligibility rules as a threat to boycott to force all high school athletes to abide by the rules.

223.    Plaintiff and the Class received less than they otherwise would have received in a competitive marketplace, were thus damaged, and seek to recover for those damages.

224.    As a direct and proximate result of Defendants' group boycott and refusal to deal, Plaintiff and the Class have been injured and financially damaged through the denial of compensation for use of their NILs and athletic services.  Plaintiff and the Class's injuries are of the type the antitrust laws were designed to prevent and flow from the very conduct that violates the antitrust laws.

225.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants.  Moreover, to the extent any legitimate justifications may exist in theory, reasonable and less restrictive alternatives are available that would cause less competitive harm to Plaintiff and the Class.

226.    As a result, Plaintiff and the Class are entitled to treble damages, attorney's fees, and costs as set forth by law.  Additionally, Plaintiff and the Class are entitled to injunctive relief to end the anticompetitive practices alleged herein and to require Defendants to take steps to correct the market.

## COUNT III: UNREASONABLE RESTRAINT

### Violation of the Cartwright Act — Cal. Bus. & Prof. Code §§ 16720, *et seq.*

227.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

228.    All Defendants are "persons" within the meaning of the Cartwright Act because they are "corporations, firms, partnerships and associations existing under or authorized by the laws of this State or any other State . . . ."  Cal. Bus. & Prof. Code § 16702.

229.    Defendants, by and through their officers, directors, employees, agents, or other representatives, have orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in the relevant markets to artificially depress, fix, maintain, and/or stabilize the prices paid to members of the Classes for the use of, and to limit supply for the licensing and sale of, their images, likenesses, and/or names and for their athletic services in the State of California and throughout the United States in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq.*

230.    Defendants' unlawful conduct deprived Plaintiff and the Class of compensation for the use of their names, images, and likenesses and their athletic services.  This unreasonable restraint on competition has artificially limited supply and depressed compensation paid to Plaintiff and the Class.

231.    Plaintiff and the Class received less than they otherwise would have received for the use of their images, likenesses, and/or names and their athletic services in a competitive marketplace.  They were thus damaged and seek to recover for those damages.

232.    Defendants' abridgement of compensation rights for current and former high school athletes is not connected to any legitimate non-commercial goal.  Defendants' actions are solely to enhance revenue for themselves and for their for-profit business partners by being able to take the revenue related to the commercial use of students' names, images, and likenesses for themselves.  Defendants' actions have no relationship to any alleged goal of amateurism, promoting educational objectives, or other procompetitive purposes. CIF's rules instead regulate commercial markets and therefore are illegal.

233.    As a direct and proximate result of Defendants' scheme, Plaintiff and the Class have been injured and financially damaged.  Their injuries consist of receiving lower compensation for use of their NILs and for their athletic services than they would have received but for Defendants' conduct.  Plaintiff and the Class's injuries are of the type the California antitrust laws were designed to prevent and flow from the very conduct that violates those antitrust laws.

234.    Defendants have collectively conspired to illegally limit and depress the compensation for high school athletes for the use of their NILs and athletic services.

235.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants.  Moreover, to the extent any legitimate justifications may exist in theory, reasonable and less restrictive alternatives are available that would cause less competitive harm to Plaintiff and the Class.

236.    As a result, Plaintiff and the Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorney's fees and costs under Cal. Bus. & Prof. Code § 16750.

237.    Additionally, Plaintiff and the Class are entitled to injunctive relief to end the anticompetitive practices alleged herein, including for the benefit of the public, and to require Defendants to take steps to correct the market.

## COUNT IV: GROUP BOYCOTT/REFUSAL TO DEAL

### Violation of the Cartwright Act — Cal. Bus. & Prof. Code §§ 16720, *et seq*.

238.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

239.    All Defendants are "persons" within the meaning of the Cartwright Act because they are "corporations, firms, partnerships and associations existing under or authorized by the laws of this State or any other State . . . ."  Cal. Bus. & Prof. Code § 16702.

240.    Defendants, by and through their officers, directors, employees, agents, or other representatives, orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in the relevant markets to effectuate a horizontal group boycott of Class members.  Defendants' group boycott and refusal to deal encompasses their concerted acts to prevent the Class from being compensated for the use of their NILs or athletic services in the State of California and the United States in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, *et seq*.

241.    Defendants' group boycott and refusal to deal include Defendants' concerted action to require all current high school athletes to abide by their regulations.  In effect, this is a refusal to deal with members of the Class on compensation rights issues, foreclosing them from access to the marketplace.  Defendants use eligibility rules as a threat to boycott to force all high school athletes to abide by the rules.

242.    Plaintiff and the Class received less than they otherwise would have received in a competitive marketplace, were thus damaged, and seek to recover for those damages.

243.    As a direct and proximate result of Defendants' group boycott and refusal to deal, Plaintiff and the Class have been injured and financially damaged through the denial of compensation for use of their NILs and athletic services.  Plaintiff and the Class's injuries are of

the type the California antitrust laws were designed to prevent and flow from the very conduct that violates those antitrust laws.

244.    The anticompetitive effects of Defendants' scheme substantially outweigh any alleged procompetitive effects that may be offered by Defendants.  Moreover, to the extent any legitimate justifications may exist in theory, reasonable and less restrictive alternatives are available that would cause less competitive harm to Plaintiff and the Class.

245.    As a result, Plaintiff and the Class are entitled to recover three times the damages sustained by them, interest on those damages, together with reasonable attorney's fees and costs under Cal. Bus. & Prof. Code § 16750.

246.    Additionally, Plaintiff and the Class are entitled to injunctive relief, including for the benefit of the public, to end the anticompetitive practices alleged herein and to require Defendants to take steps to correct the market.

**COUNT V: UNLAWFUL AND UNFAIR BUSINESS PRACTICE**

**Violation of the Unfair Competition Law — Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

247.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

248.    All Defendants are "persons" within the meaning of the Unfair Competition Law because they are "corporations, firms, partnerships, joint stock companies, associations and other organizations of persons."  Cal. Bus. & Prof. Code § 17201.

249.    Defendants have created and carried out restrictions in trade or commerce such as the unlawful contracts, combinations, and conspiracies in restraint of trade and the group boycott and refusal to deal described in this Complaint.

250.    These conspiracies in restraint of trade and group boycott and refusal to deal involve the CIF's anticompetitive rules and regulations limiting transfer eligibility and compensation for athletic labor and student-athletes' NIL, the Section Defendants' adoption and enforcement of those rules, and the Media Defendants' acquiescence in contracts and other agreements enforcing and furthering the purposes of these anticompetitive rules and regulations.

251.     The conduct is unfair, unlawful, or fraudulent because, inter alia, it violates state and federal antitrust laws and common law principles of unjust enrichment.

252.     Further, the conduct is unfair because it deprives Plaintiff and the Class of basic economic rights, offends public policy, and is immoral, oppressive, or unscrupulous, including the right to earn a bargained-for wage in exchange for work performed and for the use of their name, image, and likeness, at rates that the market demands.

253.     The anticompetitive effects of these restrictions outweigh any beneficial effect on competition in the market for drivers based on the market definition alleged here.

254.     Plaintiff and the Class have been harmed by these unlawful restrictions in trade or commerce.

255.     The conduct has caused and is causing damage and irreparable injury to Plaintiff and class members.  Plaintiff and class members are entitled to disgorgement of Defendants' profits and injunctive relief and restitution, plus interest and attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

256.     Further, unless the illegal restraints are permanently enjoined, they will persist. Plaintiff and the Class are entitled to a permanent injunction that terminates the restraints.

## COUNT VI: UNJUST ENRICHMENT

257.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

258.     Defendants have been unjustly enriched as a result of their unlawful conduct alleged herein at the expense of Plaintiff and the Class.  Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred upon them via their wrongful conduct.  It would be unjust for them to be allowed to do so.

259.     Plaintiff seeks disgorgement of Defendants' profits resulting from the wrongful conduct alleged herein and the establishment of a constructive trust from which Plaintiff and the Class may seek restitution.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in Plaintiff's favor and in favor of those similarly situated as follows:

    a.  Certifying and maintaining this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), with Plaintiff as designated class representative and with his counsel appointed as class counsel;

    b.  Declaring Defendants in violation of each of the counts set forth above;

    c.  Awarding actual treble damages for antitrust injuries to Plaintiff and those similarly situated;

    d.  Awarding pre-judgment, post-judgment, and statutory interest;

    e.  Awarding attorney's fees;

    f.  Awarding costs;

    g.  Ordering equitable relief, including restitution and a judicial determination of the rights and responsibilities of the parties; and,

    h.  Awarding such other and further relief as the Court may deem just and proper.

## X.    JURY DEMAND

Plaintiff, on behalf of himself and all others similarly situated, hereby requests a jury trial on all claims so triable.

Dated: May 30, 2025      Respectfully Submitted,

By: */s/ Yaman Salahi*

Joel Benjamin Young (SBN 236662)
jby@tidricklaw.com
**THE TIDRICK LAW FIRM LLP**
1990 N. California Blvd., 8th Floor
Walnut Creek, CA 94596
Tel: (510) 788-5100
Fax: (510) 291-3226

Yaman Salahi (SBN 288752)
yaman@salahilaw.com

Nicole Cabañez (*pro hac vice* forthcoming)
nicolec@salahilaw.com
**SALAHI PC**
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2352

*Attorneys for Plaintiff and the proposed Class*