1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

San Francisco Division

11

| | |
|---|---|
| DOMINIK CALHOUN, | Case No. 25-cv-04603-LB |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| v. | |
| CALIFORNIA INTERSCHOLASTIC FEDERATION, et al., | Re: ECF Nos. 58, 60 |
| Defendants. | |

12
13
14
15
16
17

## INTRODUCTION

18

This putative class action challenges the rules that govern high-school athletics in California.

19 Plaintiff Dominik Calhoun, a former high-school football and track-and-field star, alleges that the

20 California Interscholastic Federation and its ten regional sections (the CIF defendants) and a group

21 of media and tech companies (the Media defendants) conspired to limit compensation to high-

22 school athletes, their transfer between schools, and their ability to earn money from sponsorships

23 while wearing their high-school uniforms, in violation of federal and state antitrust law. Based on

24 statutory authority, CIF promulgated rules that allegedly restricted compensation and transfers,

25 and the Media defendants — various entities that broadcast, stream, or otherwise monetize high-

26 school sports content — allegedly profit from this arrangement by exploiting student-athletes'

27 uncompensated labor without facing competitive pressure to pay fair value.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

The defendants moved to dismiss the claims. The CIF defendants argue that they are immune under the Eleventh Amendment as arms of the state and are protected by state-action antitrust immunity under *Parker v. Brown*, 317 U.S. 341 (1943), the Media defendants have no liability as a result, the plaintiff lacks Article III and antitrust standing because he alleges no injury, and he does not plausibly plead antitrust markets. The Media defendants add that the plaintiff did not plausibly allege their knowing participation in a conspiracy or causation of antitrust injury.

CIF is not entitled to Eleventh Amendment immunity: the record does not establish the state's intent that CIF is a government instrumentality or its control of CIF's operations. CIF is entitled to state-action antitrust immunity for the amateurism and transfer rules, but not for the rule limiting student-athletes' ability to license their names, images, or likenesses (NIL) only without referencing their school-affiliated identities. The plaintiff does not plead a plausible national market for NIL use: there are no allegations explaining how California high-school athletes' NIL is not reasonably interchangeable with the NIL of high-school athletes from other states or how the NIL of elite California athletes is interchangeable with the NIL of other California athletes. Standing issues are moot except for the loss of NIL compensation, which can be addressed in an amended complaint. These rulings resolve the Cartwright Act and UCL claims. There is no plausible claim against the Media defendants, who have no connection to the challenged CIF rules and merely entered into contracts with CIF.

**STATEMENT**

## 1. The Parties and Claims

Plaintiff Dominik Calhoun played football and participated in track and field at two California high schools between 2021 and 2024.[1] He complains that rules governing high-school sports in California unreasonably restrain trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., and California's Unfair Competition Law (UCL), *id.* § 17200 et seq.[2]

---

[1] Compl. – ECF No. 1 at 7 (¶ 8). Citations refer to the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] *Id.* at 6 (¶ 4).

1       There are two sets of defendants: the CIF defendants and the Media defendants.

2       CIF is a California nonprofit corporation that administers high-school athletics in California

3 through standardized rules. Its members include over 1,600 public and private high schools,

4 primarily public-education employees.[3] Its governing body is the CIF Federated Council,

5 comprised of representatives from its member schools.[4] The member schools are organized into

6 ten regional sections, all nonprofit corporations, created to oversee sports in their geographic

7 regions. The sections are organized into local leagues. Each member school is represented on the

8 league level, and those representatives select a representative to a section governing board. Section

9 governing boards select representatives to the CIF Federated Council.[5] Cal. Educ. Code §

10 33353(a)(1). Sections can adopt their own rules, but their rules cannot conflict with CIF's rules.[6]

11 CIF is self-governed: its members adopt and enact their constitution and bylaws at the state,

12 section, and league levels.[7] CIF and its sections engage in marketing, sponsorship, and/or digital-

13 content production with third-party companies, including the Media defendants.[8]

14       The Media defendants, which receive revenue as a result of CIF's challenged rules, consist of

15 four companies or corporate families:

16     • 2080 Media, Inc., doing business as PlayOn! Sports. It owns defendants MaxPreps, Inc.,

17        NFHS Network, LLC, VNN, Inc., and Huddle Tickets, LLC (doing business as Go Fan). It

18        has raised nearly $100 million in private-equity funding.[9]

---

[3] *Id.* at 2 (¶ 2), 8 (¶ 13), 9 (¶¶ 16, 18); CIF Const., Ex. 1 to Req. for Jud. Notice – ECF No. 59-1 at 7 (p. 4), 22–24 (pp. 19–21) (Const. art. 3, §§ 30–34). The court judicially notices CIF's constitution and bylaws. Req. for Jud. Notice – ECF No. 59 (unopposed). The documents are not disputed and can be considered under the incorporation-by-reference doctrine. Fed. R. Evid. 201(b); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[4] Compl. – ECF No. 1 at 9 (¶ 18).

[5] *Id.* (¶ 19).

[6] *Id.* at 10 (¶ 22).

[7] *Id.* at 8 (¶ 14), 9 (¶ 19), 10 (¶ 22).

[8] *Id.* at 10–13 (¶¶ 22–32).

[9] *Id.* at 14–16 (¶¶ 33–37), 49 (¶ 137).

- Playfly, LLC, a marketing company that provides signage, game sponsorships, and community outreach to California high schools.[10]

- SBLive Sports, Inc., which offers software solutions for scorekeeping and media publishing.[11]

- Spectrum SportsNet, LLC, which has rights to televise certain CIF sporting events.[12]

**2. California Law and Regulations on Interscholastic Athletics**

School-district governing boards have general control of all aspects of interscholastic athletic programs. They must ensure that policies comply with federal and state law. They may enter into "associations or consortia . . . for the purpose of governing regional or statewide interscholastic athletic programs by permitting the public schools under their jurisdictions to enter into a voluntary association with other schools for the purpose of enacting and enforcing rules relating to eligibility for, and participation in, interscholastic athletic programs among and between schools." Cal. Educ. Code § 35179(a)–(b).

CIF is such a voluntary organization. *Id.* § 33353(a) (CIF "is a voluntary organization that consists of school and school-related personnel with responsibility for administering interscholastic athletic activities in secondary schools"). It has the authority to implement the following policies: (1) give school boards the specific authority to select their athletic league representatives; (2) require that all CIF meetings be subject to open-meeting requirements under the Brown Act; (3) establish a neutral final appeals body to hear complaints related to interscholastic athletic policies; (4) provide information to parents and pupils regarding federal and state procedures for discrimination complaints; and (5) comply with public-records requirements. *Id.* § 33353(a)(1)–(5).

CIF identifies other regulations relevant to whether it is a government instrumentality.

First, the Legislature directed the State Board of Education to adopt standards that prohibit

---

[10] *Id.* at 17 (¶ 38).

[11] *Id.* (¶ 39).

[12] *Id.* at 18 (¶ 40).

United States District Court
Northern District of California

school employees "from exerting undue influence in a pupil's decision to enroll in an athletic program." *Id.* § 35179.7. CIF has defined "undue influence" to mean "any act, gesture, or communication . . . which may be objectively seen as . . . inducing a student . . . to enroll in, transfer to, or remain in, a particular school for athletic purposes."[13] The regulations bar school personnel from "recruitment of athletes from other schools." Cal. Code Regs. tit. 5, § 5596(*l*).

Second, while some schools are permitted to have "open enrollment" policies, they are barred from considering athletic performance or targeting prospective students based on athletic skill. Cal. Educ. Code § 48301(a)–(b).

Third, any broadcaster or similar entity can use student-athletes' NIL in broadcasts and accounts of high-school sporting events without obtaining the student-athletes' consent. Cal. Civ. Code § 3344(d).

### 3. The Challenged CIF Rules

The plaintiff challenges three CIF rules: (1) the amateurism rule; (2) the rules regarding athletically motivated transfers; and (3) the rules regarding NIL compensation.[14]

### 3.1 Amateurism Rule

Athletes at member schools cannot receive "athletic awards" totaling more than $250 for regular-season sanctioned games or $500 for post-season games. CIF Bylaws 200(B), 212, 802(A)–(B). "Such award cannot be cash, gift certificates, or merchandise alone. It may be "merchandise, badge, medal, plaque, ribbon, picture, certificate, or trophy, if it is suitably engraved or designated as an award." *Id.* § 802(D). Booster clubs, donors, school districts, leagues, and the like cannot contribute to make it possible to give an award exceeding these limits. *Id.* § 803.[15]

---

[13] *Id.* at 25 (¶ 66) (quoting CIF Bylaw 510(A)).

[14] *Id.* at 19–31 (¶¶ 45–84).

[15] *Id.* at 19–21 (¶¶ 45–46, 50, 52).

### 3.2    Transfer Limits

CIF Bylaws 201, 206, 207, and 510 allegedly curtail student-athletes from transferring between schools for athletic reasons.[16]

Bylaw 201 governs standards of eligibility. Students must "meet all standards of athletic eligibility" established by CIF and its sections "to be considered a student in good standing and eligible to compete for their school of enrollment."[17]

Bylaw 206 governs residential eligibility. Student-athletes acquire residential eligibility upon enrolling in a CIF member school as a ninth grader or upon a valid change of residence to another school. CIF can nullify a change of address if it determines that it was athletically motivated.[18]

Bylaw 207 governs transfer eligibility. A transfer student is not eligible to compete for the new school "until a determination has been made by their respective CIF Section." The student, parents, and school must disclose all pre-enrollment contacts. Representatives of the transferor and transferee schools (e.g., the principal and athletic director) must attest that they have no credible evidence of the athletic department or a booster club communicating with the student or parents before the enrollment process is complete.[19]

Bylaw 510 governs undue influence, pre-enrollment contact, disclosures of contacts, and athletically motivated transfers. It prohibits undue influence (including financial compensation) to induce students to attend a CIF-member school to play sports, which can result in student ineligibility and jeopardizing the schools' standing in the CIF.[20]

### 3.3    NIL Compensation Limits

CIF Bylaws permit student-athletes to license their NIL "provided there is no school team or school affiliation" or affiliation with "a league, CIF Section(s), or CIF State," and students are not

---

[16] *Id.* at 21–22 (¶¶ 54–56).

[17] *Id.* at 22 (¶ 56) (quoting CIF Bylaw 201).

[18] *Id.* at 22–23 (¶¶ 57–59) (citing and quoting CIF Bylaw 206).

[19] *Id.* at 24–25 (¶¶ 61–64) (citing and quoting CIF Bylaw 207).

[20] *Id.* at 25–26 (¶¶ 66–68) (citing and quoting CIF Bylaw 510).

United States District Court
Northern District of California

1    "[w]earing a school team uniform or any identifying school insignia."[21]

2

3    **4.  The Alleged Relevant Markets**

4        The plaintiff alleges harm in two markets: (1) the statewide market for California high-school

5    student-athlete labor and (2) the national market for California high-school student-athlete NIL.[22]

6        The first market is a statewide market for the athletic labor of CIF student-athletes in the various

7    sports in which they compete, with each sport constituting its own submarket. CIF's anticompetitive

8    restrictions allegedly suppress the size of the market, which would expand significantly in the

9    absence of the restrictions. Absent the rules, students allegedly would transfer for athletic reasons

10   and to obtain compensation for participating in high-school athletics.[23]

11       The second market is "the national market for the use of California high school student-athletes

12   names, images and likenesses for commercial and promotional purposes" such as "in sports data

13   and marketing software" and in "broadcasts of athletic competitions." The CIF's rules prevent

14   student athletes from receiving compensation for their NIL. Absent the rules, student-athletes would

15   receive a share of revenues generated from the use of their NIL and broadcast rights.[24]

16

17   **5.  Other Procedural History**

18       The parties consented to magistrate-judge jurisdiction. 28 U.S.C. § 636(c)(1).[25] The court held a

19   hearing on December 18, 2025.

20                                    **ANALYSIS**

21       A complaint must contain a short and plain statement of the claim showing that the pleader is

22   entitled to relief to give the defendant fair notice of the claim and the grounds upon which it rests.

23   Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court accepts as

24

25   [21] *Id.* at 28 (¶ 77) (citing and quoting CIF Bylaw 212(C)(3)–(4)).

26   [22] *Id.* at 33 (¶ 91), 38 (¶ 107), 51 (¶ 141).

     [23] *Id.* at 33 (¶¶ 91–92), 37 (¶ 103).

27   [24] *Id.* at 36 (¶ 100), 38–39 (¶¶ 107–08).

28   [25] Consents – ECF Nos. 7, 21, 26, 34, 48, 56.

United States District Court
Northern District of California

true the complaint's factual allegations and construes them in the light most favorable to the plaintiffs. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018). A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### 1. Eleventh Amendment Immunity

The Eleventh Amendment immunizes states, and arms of the state, from suit in federal court absent the state's consent or Congress's abrogation of immunity. *Papasan v. Allain*, 478 U.S. 265, 276–77 (1986); *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1025–26 (9th Cir. 2023) (en banc); *Bellanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 251–54 (9th Cir. 1992) (California school districts are arms of the state).[26] The CIF defendants contend that they are arms of the state.[27] The plaintiff counters that CIF is a private entity with autonomy, not an alter ego of California.[28]

Three factors determine whether an entity is an arm of the state: "(1) the state's intent as to the status of the entity, including the functions performed by the entity; (2) the state's control over the entity; and (3) the entity's overall effects on the state treasury." *Kohn*, 87 F.4th at 1030 (cleaned up). The issue is close. But the record at the pleadings stage does not establish the state's intent and control in a manner akin to *Kohn*.

### 1.1 The State's Intent

This factor turns on (1) whether state law expressly characterizes the entity as a governmental instrumentality (rather than a local governmental or non-governmental entity), (2) whether the entity performs state governmental functions, (3) whether the entity is treated as a governmental

---

[26] This includes state-law claims brought against a state in federal court under the supplemental jurisdiction statute, 28 U.S.C. § 1367. *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 541–42 (2002); *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 846–47 (9th Cir. 1999) (state's consent to be sued under FEHA in state court does not constitute consent to suit in federal court). The Eleventh Amendment does not bar suits against a state brought by the United States, *Emps. of the Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 289 (1973), or by a sister state, *United States v. Mississippi*, 380 U.S. 128, 140–41 (1965).

[27] Mot. – ECF No. 58 at 18–25.

[28] Opp'n – ECF No. 67 at 24–33.

1    instrumentality for purposes of other state law, and (4) state representations about the entity's

2    status favors sovereign immunity. *Id.* The record does not establish California's intent that CIF is a

3    governmental instrumentality.

4         School districts have general control of interscholastic athletic policies, and CIF, a voluntary

5    association, has the authority to enact and enforce rules relating to the administration of

6    interscholastic athletics. Cal. Educ. Code §§ 33353, 35178–79; *Steffes v. CIF*, 176 Cal. App. 3d

7    739, 750 (1986). California school boards have Eleventh Amendment immunity. *Bellanger*, 963

8    F.2d at 251–54. CIF is comprised of public and private school personnel, and it is subject to

9    classic government requirements such as open meetings under the Brown Act and public-records

10   requirements. Complaints related to its policies are heard by a "neutral final appeals body." Cal.

11   Educ. Code § 33353(a)(1)–(5). The defendants contend that these functions show that the state

12   Legislature intended CIF and its sections to act as arms of the state.[29]

13        CIF performs governmental functions: regulating high-school athletics. But the statute does not

14   explicitly characterize CIF as a government instrumentality and instead allows its existence as a

15   voluntary organization. CIF is comprised of public and private school members and is subject to

16   Sunshine/Brown Act transparency requirements, such as public access to meetings and records,

17   which the defendants assert as favoring immunity. The requirements make policy sense, given

18   CIF's regulation of athletics and its membership that includes districts covered by the Brown Act.

19   Cal. Gov't Code §§ 54951–52; *Kavanaugh v. W. Sonoma Cnty. Union High Sch. Dist.*, 29 Cal. 4th

20   911, 924 n.11 (2003), *as modified* (Apr. 16, 2003). A neutral appeals board makes sense for similar

21   reasons. But these requirements are not the equivalent of a statutory characterization of CIF as a

22   governmental instrumentality or its treatment as a governmental instrumentality for purposes of

23   other state law. *Kohn*, 87 F.4th at 1032 (state law "characterizes" the California State Bar as a

24   "government instrumentality"). Also, CIF's bylaws are imposed by school delegates, public and

25   private, not state officials. It is funded not by the state but instead by dues, revenues, and

26

27

---

[29] Mot. – ECF No. 58 at 19–23.

United States District Court
Northern District of California

sponsorships.[30] The statute's acknowledgment of CIF is a recognition of its authority, not an intent to treat it as a government instrumentality. Cal. Educ. Code § 33353. The Legislature could have characterized CIF as a government instrumentality. *Cf. Kohn*, 87 F.4th at 1030, 1032. It did not.

The Legislature's characterization is not the only metric for the intent factor. State-court treatment also is relevant. *Id.* at 1032. Courts have treated CIF actions as state action under California law, subjecting it to the limitations of the California Constitution.[31] *Jones v. CIF*, 197 Cal. App. 3d 751, 756–58 (1988) (enforcement of CIF's eligibility rules was state action); *Ryan v. CIF-S.D. Section*, 94 Cal. App. 4th 1048, 1057–76 (2001) (holding that CIF's procedural rules were adequate under California's due-process clause and that its development of the administrative record supported CIF-San Diego's finding of undue influence). Similarly, the U.S. Supreme Court, reversing the Sixth Circuit, determined that Tennessee's Secondary School Athletic Association was a state actor, given the "pervasive entwinement of public institutions and public officials in its composition and workings."[32] *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 293, 298–301, 304 (2001) (noted that other circuits had concluded that statewide athletic associations were state actors). On remand, the district court granted summary judgment to the athletic association on the antitrust claims asserted against it, holding that it was entitled to antitrust immunity. No. 3:97-1249, 2002 WL 32333036, at *1 (M.D. Tenn. Oct. 25, 2002) (applying *Parker v. Brown*, 317 U.S. 341 (1943)).

An entity's action can be state action for purposes of constitutional analysis and not render the entity the state for purposes of Eleventh Amendment immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 104–05 (1984); *Crowe v. Or. State Bar*, 989 F.3d 714, 730 (9th Cir. 2021). State action is a "necessarily fact-bound inquiry" and exists only if there is such a close nexus between the state and the challenged action that the action "may be fairly treated" as state action. *Brentwood*, 531 U.S. at 295–99. By contrast, under the three-part Eleventh Amendment

---

[30] Compl. – ECF No. 1 at 9 (¶ 17), 29 (¶ 78), 42–49 (¶¶ 120–37).

[31] Mot. – ECF No. 58 at 21–23; Reply – ECF No. 69 at 13 n.3 (collecting cases).

[32] Mot. – ECF No. 58 at 22–23.

1    immunity test, the entity's status does not change from one case to another based on variable facts:

2    the entity is or is not an arm of the state. *Kohn*, 87 F.4th at 1031.

3        The state-action decisions, which turn on facts relevant to the challenged actions, are not

4    conclusive on the issue of Eleventh Amendment immunity. It is not surprising that particular CIF

5    decisions enforcing its regulatory rules were state actions. By contrast, the three-factor immunity

6    analysis turns not on CIF's decisions implementing its rules but instead on its status and functions:

7    the state's intent as to its status (including its functions), the state's control of it, and its effect on the

8    state's treasury. *Id.* at 1030.

9        The record about California's intent is at best mixed. On the one hand, the Education Code

10    recognizes CIF's authority to regulate interscholastic athletics, CIF's role is tied closely to the

11    public-school system, and courts have recognized that CIF's enforcement of its rules are state

12    action. On the other hand, the Legislature did not create CIF as a governmental instrumentality and

13    instead recognizes and regulates it as a voluntary private association. On balance, the record here

14    does not approximate the state-intent record in *Kohn*: the State Bar was codified in the state

15    constitution, its property was held in the judicial branch, its evidences of indebtedness "are issued

16    for essential public and governmental purposes in the judicial branch," and the California Supreme

17    Court described it as its administrative arm for attorney discipline and "a constitutional entity within

18    the judicial article of the California Constitution." *Id.* at 1032 (cleaned up). The record does not

19    support the conclusion that California intended CIF to be a governmental entity.

20    **1.2    The State's Control**

21        This factor "depends on how members of the governing body of the entity are appointed and

22    removed, as well as whether the state can directly supervise and control the entity's ongoing

23    operations." *Id.* at 1030 (cleaned up).

24        CIF is self-governed: its members adopt and enact their constitution and bylaws at the state,

25    section, and league levels.[33] Sections rules cannot conflict with CIF's rules.[34] CIF's governing

26

27    _____
      [33] Compl. – ECF No. 1 at 8 (¶ 14), 9 (¶ 19), 10 (¶ 22).

28    [34] *Id.* at 10 (¶ 22).

1   body is the CIF Federated Council, comprised of representatives selected by its member schools

2   (public and private), Cal. Educ. Code § 33353(a)(1),[35] and a representative from the State

3   Department of Education.[36] A list of current members and their titles shows that they are primarily

4   government employees.[37] If the Department of Education "states" that CIF "is not in compliance

5   with state or federal law, the department may require [it] to adjust its policy so that it is in

6   compliance. However, the department shall not have authority to determine the specific policy"

7   that CIF "must adopt in order to comply with state and federal law." *Id.* § 33354(a)(2)(A). A

8   complainant may file a claim of discrimination against the CIF directly with the Department of

9   Education. *Id.* § 33354(a)(2)(B). CIF must submit a report to the Legislature and the Governor

10   every seven years on its goals, objectives, and statuses on topics that include providing leadership

11   for interscholastic athletics in secondary schools, the quality of coaching and officiating (including

12   professional development), parent education, and the economic viability of interscholastic

13   athletics, including promotion and marketing. *Id.* § 33353(b)(1). It must testify at hearings before

14   legislative policy committees, where members of the public are encouraged to testify on issues in

15   CIF's reports. *Id.* § 33353(b)(3)(A).

16       The state-control factor does not support immunity. California does not appoint CIF members,

17   dictate eligibility rules, or oversee enforcement. CIF contends that its membership is primarily

18   school-district and other government employees.[38] But it is autonomous and self-governing. Its

19   reporting requirement — robust as it is — is only every seven years. Its obligation to testify is

20   perhaps active participation in legislative process, but it does not amount to state control.

21       Moreover, the Department of Education, through its single representative — there by operation

22   of CIF's constitution, not by statute — can require compliance, but it cannot determine CIF's

23   policies. *Id.* § 33354(a)(2)(A). Oversight, without control, does not convert CIF — even though

---

25   [35] *See supra* Statement (summarizing the statutory scheme).

26   [36] CIF Const. art. 3 § 30, Ex. 1 to Req. for Jud. Notice – ECF No. 59-1 at 22 (p. 19).

27   [37] CIF Exec. Comm., Federated Council, & Sections, Ex. 1 to Req. for Jud. Notice – ECF No. 59-1 at 7 (p. 4).

28   [38] Mot. – ECF No. 58 at 23; Reply – ECF No. 69 at 12–13.

comprised primarily of public-school members — into an arm of the state. *See Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (four of five city police commissioners were appointed by the governor but were not subject to the state's control otherwise, and the city was responsible for the board's financial liabilities; the board was not an arm of the state entitled to Eleventh Amendment immunity). There is not the pervasive control seen in *Kohn*: government appointment of the State Bar's board of trustees and the Commissioner of Bar Examiners; Supreme Court control of all admission rules; Supreme Court review of all admission and disciplinary decisions; and legislative control of raising revenue and annual budgets. 87 F.4th at 1035–36.

### 1.3    Entity's Overall Effects on the State Treasury

This factor is relevant but not dispositive. *Id.* at 1030. "[T]he relevant issue is a state's overall responsibility for funding the entity or paying the entity's debts or judgments, *not* whether the state would be responsible to pay a judgment *in the particular case at issue.*" *Id.* at 1036 (cleaned up). "[I]n the absence of a showing that money used to pay a judgment will necessarily be replaced with state funds, we adhere to our basic proposition that the fact that the state may ultimately *volunteer* to pay the judgment is immaterial." *Id.* at 1037 (cleaned up).

CIF is funded largely by member schools and revenues.[39] CIF acknowledges that it does not routinely receive direct state funding but contends that an overall effect is shown because during the COVID-19 pandemic, the Legislature appropriated $10.5 million from the General Fund to CIF "to be used to support the expenses associated with either the CIF State or 10 CIF Section offices that have experienced significant revenue reductions in the 2020–21 fiscal year."[40] A.B. 167, 2021–2022 Reg. Sess. (Cal. 2021).

CIF is funded by dues and revenues, not state funds. A one-time pandemic appropriation does not alter this conclusion. Nothing suggests that state funds would fund a judgment. That said, the court does not rely heavily on this factor. *Kohn*, 87 F.4th at 1030.

\*    \*    \*

---

[39] *See supra* Statement.

[40] Mot. – ECF No. 58 at 24–25; Reply – ECF No. 69 at 16–17.

1    The best argument for Eleventh Amendment immunity is that CIF is a consortium primarily

2    composed of public-school representatives, is bound by state regulatory requirements, and ought to

3    enjoy Eleventh Amendment immunity. But the record does not establish the state's intent:

4    California has recognized CIF's authority to regulate interscholastic athletics but has not

5    acknowledged it as a governmental instrumentality. *Cf. id.* at 1032. California does not control CIF,

6    which is autonomous and self-governing, unlike the pervasive control in *Kohn*. *Id.* at 1035–36. The

7    record does not support the conclusion that CIF has Eleventh Amendment immunity.

8

9    **2.  State-Action Antitrust Immunity**

10    The state-action immunity doctrine bars antitrust actions that attempt to "restrain a state or its

11    officers or agents from activities directed by its legislature." *Parker*, 317 U.S. at 350–51. For

12    private actors, state-action immunity applies when (1) the challenged restraint is "clearly articulated

13    and affirmatively expressed as state policy," and (2) the state actively supervises the policy. *Cal.*

14    *Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980); *N.C. State Bd. of*

15    *Dental Exam'rs v. FTC*, 574 U.S. 494, 503–04 (2015). Prong two — active state supervision — is

16    not required for state actors. *Hass v. Or. State Bar*, 883 F.2d 1453, 1459–61 (9th Cir. 1989).

17    Under prong one, the state must "clearly intend to displace competition in a particular field with

18    a regulatory structure in the relevant market." *Chamber of Com. of the U.S. v. City of Seattle*, 890

19    F.3d 769, 782 (9th Cir. 2018) (cleaned up; quoting *S. Motor Carriers Rate Conf., Inc. v. United*

20    *States*, 471 U.S. 48, 64 (1985)). Implicit authorization to displace competition may be inferred

21    where displacement "was the inherent, logical, or ordinary result of the exercise of authority

22    delegated by the state legislature." *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 229

23    (2013). Immunity thus applies to restraints that are the foreseeable result of the statutory

24    authorization.[41] *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 370–71 (1991) (the

25    challenged actions were an "authorized implementation of state policy" and suppression of

26    competition was a foreseeable consequence of the ordinance); *Kern-Tulare Water Dist. v. City of*

27

---

28    [41] Mot. – ECF No. 58 at 26 (making this point).

1    *Bakersfield*, 828 F.2d 514, 518–19 (9th Cir. 1987) (clear-articulation requirement satisfied if "the

2    restraint is a 'foreseeable result' which results logically from a broad grant of regulatory authority"

3    (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 42 (1985)).

4        The California Education Code prohibits high-school officials from exerting undue influence

5    in a student's decision to join a particular athletic program, prohibits recruitment of athletes from

6    other schools, prohibits consideration of athletic performance or targeting students based on

7    athletic skills, and authorizes the uncompensated use of student athletes' NIL. Cal. Educ. Code §§

8    35179.7, 48301(a)–(b); Cal. Code Regs. tit. 5, § 5596(*l*); Cal. Civ. Code § 3344(d).[42] It allows

9    school "[g]overning boards" to enter into "associations or consortia . . . for the purpose of

10   governing regional or statewide interscholastic athletic programs by permitting the public schools

11   under their jurisdictions to enter into a voluntary association with other schools for the purpose of

12   enacting and enforcing rules relating to eligibility for, and participation in, interscholastic athletic

13   programs among and between schools." Cal. Educ. Code § 35179(b). CIF is such an organization.

14   *Id.* § 33353; *Steffes*, 176 Cal. App. 3d at 742.

15       This regulatory scheme demonstrates that the Legislature anticipated and intended restraints on

16   competition in favor of the objectives of amateurism and prioritizing education. Rules relating to

17   payment, transfers, and use of NIL without permission are reasonably foreseeable results of a

18   regulatory scheme that forbids undue influence on enrollment decisions, bars recruitment of

19   athletes from other schools or consideration of athletic performance, and allows the use of NIL

20   without compensation. More specifically, the amateurism rule (with its limits on cash payments)

21   and the rules on transfer are reasonably foreseeable results of the regulatory scheme.[43]

22       The analysis of the rule governing NIL compensation is more nuanced. Broadcasters and

23   similar entities can use student-athletes' NIL in broadcasts and accounts of high-school sporting

24   events without permission. Cal. Civ. Code § 3344(d). CIF Bylaws allow student-athletes to license

25

26

27   [42] *See supra* Statement (discussing regulatory scheme).

28   [43] *See id.* (summarizing the challenged CIF rules).

United States District Court
Northern District of California

their NIL but only without any school, team, league, or CIF affiliations or insignia.[44] The record does not support the conclusion that either (1) the Legislature clearly intended to deprive student-athletes categorically of revenues derived from their NIL that includes their school-affiliated identities or (2) the bylaw is a reasonably foreseeable result of § 3344(d). While § 3344(d) allows uncompensated use of NIL in broadcasts, it does not foreseeably authorize a categorical bar on student-athletes sharing revenues from school-affiliated NIL, as this extends beyond authorization to use NIL without consent. The plaintiffs thus plausibly plead a challenge to the NIL rule.

The plaintiffs contend that they plead plausible challenges to the amateurism and transfer rules too, primarily because eligibility rules for interscholastic athletics are not inherently anticompetitive. They assert that *City of Seattle* demonstrates this principle.[45] There, the Washington state legislature authorized municipal regulation of for-hire transportation companies but said nothing about the relationship between ride-share companies and their drivers. 890 F.3d at 783–85. Thus, the Ninth Circuit held, there was no implicit state authorization or intent to displace competition. *Id.* at 784. California's statutory scheme, by contrast, grants CIF authority to regulate high-school athletics, including recruitment and the conditions for participation, in aid of the objectives of amateurism and prioritizing education. The displacement of competition is the "inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." *Phoebe Putney*, 568 U.S. at 229.

Prong two, assuming it applies,[46] is satisfied too.

"Actual state involvement, not deference to private pricefixing arrangements under the general auspices of state law, is the precondition for immunity from federal law." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992). The court must "determine whether the State has exercised sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private

---

[44] Compl. – ECF No. 1 at 28 (¶ 77) (citing and quoting CIF Bylaw 212(C)(3)–(4)).

[45] Opp'n – ECF No. 67 at 37–40 (citing *City of Seattle*, 890 F.3d at 775, 783–84).

[46] The parties dispute whether it does. Mot. – ECF No. 58 at 28; Opp'n – ECF No. 67 at 40.

parties." *Id.* at 634–35. "[T]he analysis asks whether the State has played a substantial role in determining the specifics of the [challenged] economic policy." *Id.* at 635. "The active supervision requirement demands . . . 'that state officials have and exercise power to review *particular anticompetitive acts* of private parties and disapprove those that fail to accord with state policy.'" *City of Seattle*, 890 F.3d at 787 (emphasis added) (quoting *Dental Exam'rs*, 574 U.S. at 507).

CIF operates in a regulated environment. Its rulemaking is subject to statutory provisions governing amateurism, recruitment, enrollment, and compensation. It is comprised primarily of public-education employees. The Department can require CIF to "adjust its policy." Cal. Educ. Code § 33354(a)(2)(A). A California Department of Education representative sits on its board.[47] CIF must appear annually for testimony before the Legislature and make detailed reports every seven years. *Id.* § 33353(b)(1), (b)(3). Its deliberations are public, its meetings are open, and its decisions are subject to public comment. *Id.* § 33353(a)(2), (b)(2). This is state oversight.

The plaintiff contends that supervision is not established because the California Department of Education's only recourse is to ask a court to "determine the matter de novo." *Id.* § 33354(a)(3).[48] This does not alter the Department's authority to require CIF to adjust its policy.

* * *

CIF is entitled to state-action antitrust immunity for the amateurism rule (with its limits on cash payments) and the rules on transfer but not for the rule limiting student-athletes ability to license their NIL only if it does not include their school-affiliated identities.

### 3.  The Media Defendants

The Media defendants have no connection to the CIF rules challenged in the case. There are no allegations that they crafted or implemented them or performed any tasks in execution of a conspiracy. They did not join an antitrust conspiracy and instead merely entered into contracts with CIF defendants under a statutory scheme that allows them to use student-athletes' NIL in broadcasts

---

[47] *See supra* Statement (summarizing statutory scheme and rules).

[48] Opp'n – ECF No. 67 at 42.

United States District Court
Northern District of California

and accounts of high-school sporting events without permission, which also means that they did not cause antitrust injury or any injury. *See* Cal. Civ. Code § 3344(d) (allowing use of student-athletes' NIL without their consent); *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (no evidence of agreement where the defendants "merely accepted" the professional golf tour's "rules and regulations and played no role in creating or enforcing them"). There is no plausible claim.

## 4. Standing

The motions to dismiss for lack of Article III and antitrust standing are largely mooted by the ruling that CIF is entitled to state-action antitrust immunity for the amateurism and transfer rules. The remaining alleged injury is the loss of NIL compensation.[49] High-school athletes do not have a statutorily enforceable right to payment for the use of their NIL in broadcast footage. Cal. Civ. Code § 3344(d). The plaintiff concedes that he lacks standing for injunctive relief and intends to amend to add plaintiffs with standing.[50] The court gives leave to amend and will consider standing arguments in the context of an amended complaint.

## 5. Plausible Markets

CIF contends that the plaintiff does not allege plausible relevant markets under the rule of reason.[51] The market is the national market for California high-school student-athlete NIL.[52]

Under the rule of reason, a plaintiff must prove anticompetitive effects in a relevant market. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (unless asserting a per se claim). Relevant markets are defined on the basis of reasonable interchangeability. *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105 (9th Cir. 1999) (affirming dismissal when the plaintiff did not allege adequately that the asserted market was "the area of effective competition" and there were no other goods or services reasonably interchangeable). If a plaintiff does not "define its

---

[49] Compl. – ECF No. 1 at 76 (¶¶ 213–14).

[50] Opp'n – ECF No. 67 at 49 n.6.

[51] Mot. – ECF No. 58 at 37–40; Reply – ECF No. 69 at 31–35.

[52] *See supra* Statement (market definitions).

United States District Court
Northern District of California

1    proposed relevant market with reference to the rule of reasonable interchangeability and cross-

2    elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all

3    interchangeable substitute products even when all factual inferences are granted in plaintiff's favor,

4    the relevant market is legally insufficient and a motion to dismiss may be granted." *In re eBay*

5    *Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1031 (N.D. Cal. 2008) (cleaned up).

6        The plaintiffs do not plausibly explain why high-school athletes' NIL is not reasonably

7    interchangeable with the NIL of high-school athletes from other states. The complaint alleges that

8    broadcast and streaming rights for high-school sports are consolidated on a national level to make

9    it "easier for regional and national brands to make large advertising buys."[53] This suggests that

10   advertisers in the national market target regional and national markets where California athletes'

11   NIL would not be a unique commodity without explaining why the NIL of many states' athletes'

12   NIL would not be reasonably interchangeable to advertisers seeking to reach national audiences.[54]

13       Also, the plaintiff did not plausibly allege that the NIL of certain California athletes (e.g., elite

14   basketball athletes) is reasonably interchangeable with the NIL of other California athletes (e.g.,

15   junior-varsity badminton athletes).[55] The complaint's allegations suggest that consumers view

16   high-end sports like basketball differently from other sports.[56] It does not allege that fans consider

17   elite sports comparable to other sports. *See In re NFL's Sunday Ticket Antitrust Litig.*, 933 F.3d

18   1136, 1155 (9th Cir. 2019) ("professional football games have no substitutes" because "fans do

19   not consider NFL games to be comparable to other sports or forms of entertainment").

20

21   **6. State Law Claims**

22       The legal standards for the Cartwright Act and UCL claims are generally the same for claims

23   under the Sherman Act.[57] *StubHub, Inc. v. Golden State Warriors, LLC*, No. C 15-1436 MMC,

24

---

25   [53] Compl. – ECF No. 1 at 40 (¶ 113) (cleaned up).

26   [54] Reply – ECF No. 69 at 34 (making this argument).

     [55] *Id.* at 34–35 (making this argument).

27   [56] Compl. – ECF No. 1 at 41 (¶ 115).

28   [57] Opp'n – ECF No. 67 at 63 (conceding this point).

United States District Court
Northern District of California

1    2015 WL 6755594, at *4 (N.D. Cal. Nov. 5, 2015) (Cartright Act was modeled after the Sherman

2    Act and the analysis mirrors federal law; quoting *County of Tuolumne v. Sonora Cmty. Hosp.*, 236

3    F.3d 1148, 1160 (9th Cir. 2001)); *PTI, Inc. v. Philip Morris Inc.*, 100 F. Supp. 2d 1179, 1196

4    (C.D. Cal. 2000) (interplay with Sherman and Cartwright Acts); *Sanders v. Lockyer*, 365 F. Supp.

5    2d 1093, 1104–05 (N.D. Cal. 2005) (where the defendants enjoyed state-action immunity, they

6    were also immune from liability for Cartwright Act and UCL claims). UCL claims stand or fall

7    based on whether the Sherman Act and Cartwright Act claims are sufficiently pled. *Jones v.*

8    *Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal. 2019). Most courts do not recognize free-

9    standing claims for unjust enrichment, and in any event, even construing the claim — as the

10    plaintiff suggests[58] — as a quasi-contract claim, no allegations support that claim. *Griffith v.*

11    *TikTok, Inc.*, No. 5:23-cv-00964-SB-E, 2023 WL 9019035, at *6 (C.D. Cal. Dec. 13, 2023).

12        The UCL claim survives only to the extent that the predicate antitrust claims survive.

13

14                                   **CONCLUSION**

15        This resolves ECF Nos. 58 and 60. Any amended complaint is due by February 2, 2026. It

16    must attach a blackline compare of the amended complaint against the current complaint.

17    **IT IS SO ORDERED.**

18        Dated: January 9, 2025

19                                                    _____

20                                                    LAUREL BEELER
                                                      United States Magistrate Judge

21

22

23

24

25

26

27

28    _____
      [58] *Id.* at 64.